601 So.2d 878 (1992)
Raymond E. MURRAY
v.
ALFAB, INC.
ALFAB, INC.
v.
Raymond E. MURRAY.
1900715, 1900736.
Supreme Court of Alabama.
February 14, 1992.
As Modified on Denial of Rehearing June 5, 1992.
Second Rehearing Denied July 31, 1992.
*880 Alan C. Livingston of Lee & McInish, Dothan, and Richard H. Gill and J. Fairley McDonald III of Copeland, Franco, Screws & Gill, P.A., Montgomery, for appellant.
Joe S. Pittman and Stafford Pittman of Pittman, Whittaker & Pittman, Enterprise, for appellee.
INGRAM, Justice.
These cases involve an action for a declaratory judgment and ancillary damages based on claims sounding in breach of contract and fraud. The claims arose from a contract for the sale of Specialty Maintenance and Construction, Inc. ("SMCI"), a Florida corporation, to Alfab, Inc., an Alabama corporation headquartered in Enterprise.
In 1985 Raymond E. Murray, Fred Solomon, and James G. Solomon, the shareholders of SMCI, decided to sell SMCI. Murray, the appellant, contacted Alfab regarding the possible sale of SMCI. Alfab was interested in SMCI, because it was a competitor and purchasing it presented an opportunity for Alfab to enter the Florida market. Preliminary negotiations took place in Enterprise and in Florida. The closing took place in Lakeland, Florida, on January 31, 1986.
At the closing, a contract for sale was drafted and executed by Alfab and by the shareholders of SMCI. The consideration for the sale of all the shares of stock in SMCI was $2,249,203.00, of which $2,000,000.00 was paid at the closing, with the remaining $249,203.00 being placed in escrow. The contract states as follows:
"Stockholders have agreed to sell all of their stock in SMCI to ALFAB for the sum of $2,249,203.00, subject to the following adjustments:
"SMCI must have a net worth on January 31, 1986, of $1,244,673.00, represented by a review financial statement prepared by Baumann, Fabricant & Co., P.A., Certified Public Accountants, as of January 31, 1986. The purchase price is to be increased or decreased dollar for dollar respecting any change therein as of January 31, 1986.
"The consideration mentioned herein shall be disbursed as follows:

 "Stockholders Cash Escrow Total
"Raymond E. Murray $1,326,635.70 $165,296.35 $1,491,932.05
"Fred L. Solomon, Jr. 298,399.35 37,181.08 335,580.43
"James G. Solomon 298,399.36 37,181.08 335,580.44
 _____________ ___________ _____________
"Subtotal $1,923,434.41 $239,658.51 $2,163,092.92
"Executive Incentive Bonus
"Malcolm Scott 76,565.59 9,544.49 86,110.08
 _____________ ___________ _____________
"Total $2,000,000.00 $249,203.00 $2,249,203.00"
 =============================== ==============

The contract also contained the following provision for the disbursement of the escrow fund:
"The shareholders of SMCI represent to ALFAB that the accounts receivable of SMCI are accurate, valid and are collectable and they further represent that the accounts of said SMCI are in existence, valid and are unencumbered, except as designated on the financial statement of the corporation. There shall be escrowed the sum of $249,203.00 of the purchase price. The purpose of the escrow fund is to make any adjustments necessary occasioned by the increase or decrease of net worth as shown by the review audit, any adjustments required to be made with the respect to the Florida State Sales and Use Tax Lien and any adjustments made necessary to insure the payment of all accounts receivable due to SMCI as shown by the books of *881 the corporation and to insure the payment of any related party obligation which might be due to SMCI. The escrowed fund shall be placed on interest bearing account and shall accrue to the shareholders/sellers and such funds shall be distributed to the shareholders upon the expiration of six (6) months and/or the settlement of the items prompting the funds to be escrowed as listed hereinabove. In the event an account receivable remains unpaid at the end of six-month periods, there shall be a deduction from the escrowed fund in an amount equal to past due item, together with its pro rata share of interest income. Once an item is removed from the effect of the escrow fund, such item or account becomes property of the stockholders/sellers."
The purchase price of $2,249,203.00, was conditioned on SMCI's having a net worth of $1,244,673.00 on the date of closing as represented by a "review financial statement" to be prepared by Baumann, Fabricant & Co. If the net worth of SMCI as reflected in the review financial statement was not $1,244,673.00, the contract provided for a dollar-for-dollar increase or decrease in the purchase price.
Immediately after the closing of the sale, Baumann, Fabricant began work on the "review financial statement." According to Baumann, Fabricant, a "review financial statement" is less involved than an audit and consists principally of inquiries to company personnel together with the application of analytical procedures to financial data. Baumann, Fabricant issued its review statement on April 4, 1986. It stated that as of January 31, 1986, the stockholders' equity in SMCI, SMCI's net worth, was $1,209,776.00, which was $34,897 less than the net worth figure of $1,244,673.00 stated in the contract as the benchmark for determining the actual purchase price.
Herbert Barr, who the parties had agreed would be the escrow agent, was also the chief negotiator for Alfab. He disagreed with the review financial statement and requested that Baumann, Fabricant change certain aspects of it. Baumann, Fabricant refused.
Sometime later, Alfab requested Baumann, Fabricant to research and prepare a "special purpose" report about the status of SMCI's contract projects as of July 31, 1986. Neil Fabricant, a partner at Baumann, Fabricant, testified that he considered this report to have been requested for the purpose of furnishing a better indication of the status of SMCI's projects on July 31, 1986, since allegedly the nature of construction contracts is that accounting for revenue and costs grows more accurate as the project progresses toward completion. A second report was issued by Baumann, Fabricant on September 4, 1986, to SMCI. This "special report" drew heavily from work done internally by SMCI's controller, Ronnie Boutwell, and showed significant erosion in the value of several projects. It did not purport to demonstrate the effect of that erosion on SMCI's net worth as of January 31, 1986. The deterioration of value reflected in the report was explained by the fact that as these jobs progressed, omissions in the original estimates and inadequate cost projects manifested themselves. The report also indicated that poor field supervision caused SMCI to incur greater costs. Baumann, Fabricant took the position that it was prohibited by accounting principles applicable to the construction industry from using the developments learned as of July 1986 to restate SMCI's net worth as of January 31, 1986. Consequently, the accounting firm simply refused to revisit its opinion of SMCI's January 31, 1986, net worth as stated in the review financial statement issued April 4, 1986. Linda Churchill, a certified public accountant with Baumann, Fabricant, produced a handwritten computation of the alleged effect of the deterioration on the net worth of SMCI as of January 31, 1986. This work was requested by Alfab for purposes that Churchill alleged were unknown to her.
Another situation came to light in the months immediately following the closing on January 31, 1986, concerning the funding of SMCI's insurance coverage. For several years prior to the purchase of SMCI by Alfab, SMCI had participated in *882 an insurance pooling arrangement with several other companies controlled by Murray. The pooling arrangement was maintained through Lincoln National Life Insurance Company ("Lincoln"). The unconventional plan allowed various participating companies to pay a small percentage of what would be a normal monthly premium directly to Lincoln while retaining the balance for the companies' use. A company would reimburse Lincoln on a weekly or biweekly basis as Lincoln paid claims on behalf of a company's employees. The plan worked as follows: An employee would submit a claim to his company; the company would file a claim with Lincoln; the claim would be paid by Lincoln from a checking account established in the particular company's name; and Lincoln would call for a wire transfer to replenish the funds in the account as the checks cleared.
Allen Andrasen, Murray's personal controller and treasurer of several companies controlled by Murray, was responsible for the plan; he testified that Murray had no involvement in the plan. Andrasen testified that he undertook to reconcile Lincoln's records of claim payments with the payments made by the Murray-controlled companies. From late 1984 to 1986, the Lincoln office was unable to provide Andrasen with the information necessary to reconcile the payments. Andrasen continued to fund claims until 1985, at which time he informed Lincoln he would no longer fund claims until the necessary information was furnished. SMCI continued to pay into the pooling arrangement.
On the day of closing, Andrasen learned that Lincoln would not continue to furnish insurance to SMCI because Murray was relinquishing his ownership interest. Because SMCI was no longer a participant in the Lincoln pooling arrangement, it became necessary for Andrasen and Ronnie Boutwell, SMCI's controller, to determine what portion of the account was to be allocated to SMCI. At closing, Murray paid Alfab the amount of its interest in the pooling fund, which was determined at that time to be $161,000.
On September 25, 1986, Andrasen received a letter from Lincoln claiming that a total of $426,000.00 was due. Andrasen disclosed this to Murray, who in turn contacted SMCI. On September 28, 1986, Andrasen attempted to meet with Boutwell and with Fred Solomon, who had stayed on at SMCI as president. Various circumstances prevented that meeting, but on October 12, 1986, Andrasen went to Lakeland, Florida, and discussed the matter with Fred Solomon and Boutwell.
At that time SMCI took the position that it did not owe anything to Lincoln because Lincoln had terminated coverage of SMCI on January 31, 1986. SMCI maintained this position even though Andrasen ultimately calculated that it owed over $220,000 of the total. According to Andrasen's calculations, SMCI owed Lincoln $161,641.55 instead of the $49,000 figure shown on the company records on January 31, 1986. Murray essentially conceded this and offered to recognize it if it was within the January stock agreement, but SMCI persisted in its position that it owed Lincoln nothing, even to the time of trial in a civil action commenced by Lincoln against SMCI and the other Murray-controlled companies that were involved. Before trial, SMCI reconsidered its position and ultimately agreed to settle with Lincoln for approximately $178,000.
On November 12, 1986, Murray and Andrasen met with Alfab representatives at SMCI's offices for the purpose of distributing the escrow fund. An outstanding sales tax lien, referred to in the above-quoted section of the contract, had been favorably resolved and there was no reason to delay disbursing the funds. At this meeting Barr, the escrow agent, accused Murray of fraud and prevailed upon him to relinquish his interest in the escrow. The Solomons had agreed to relinquish their interest, and Malcolm Scott, the former chief operating officer, whose interest in the fund was $9,544.49, agreed to relinquish his interest in favor of Alfab, but later retracted his agreement when he discovered that Barr was also accusing him of fraud.
*883 The next day, November 13, 1986, Alfab filed this action. In the original complaint, Alfab sought a declaratory judgment and named as defendants Murray, Fred Solomon, James G. Solomon (Greg), and Herbert Barr. Murray, who was served by certified mail, moved that the case be dismissed as to him because, he contended, he was not subject to personal jurisdiction in Alabama. Murray also moved to dismiss for failure to join Malcolm Scott, who claimed an interest in the escrow account and who therefore, Murray contended, was an indispensable party. The trial court denied both motions. On August 23, 1988, Alfab and the Solomon brothers filed a joint stipulation that the claim against the Solomon brothers was to be dismissed with prejudice. On August 24, 1988, a bench trial was begun, but the next day it was recessed, without a new trial date being set.
On August 26, 1988, Alfab amended its complaint, adding claims that Murray had breached the written sale agreement. On November 23, 1988, Alfab again sought to amend its complaint, this time adding claims of fraud and misrepresentation regarding the alleged liability of SMCI to Lincoln. Alfab's motion to amend was granted on December 27, 1988.
Testimony resumed before the trial court on July 9, 1990, and on November 8, 1990, the trial court awarded the entire escrow fund and an additional sum of $236,316.00 from Murray to Alfab. The trial court also awarded attorney fees and costs, determined to be $25,600.94, and awarded Herbert Barr $5,932.00; both items were to be paid from the escrow funds.
Murray raises several issues on appeal, some of which have been combined in the following discussion.

I.
The first issue raised by Murray is whether the trial court had personal jurisdiction over him. He argues that he had insufficient contacts with the State of Alabama to establish specific jurisdiction. Alfab contends that Murray had sufficient contacts with Alabama regarding the formation of the contract in this case to require him to appear here and defend. Specifically Alfab sets forth several factors that it says support its contention: (1) "extensive negotiations" between Murray and Alfab took place in Enterprise; (2) the agreement provided that it would be construed in accordance with the laws of Alabama; and (3) Murray directed his sale activities to Alfab, an Alabama corporation headquartered in this state.
The requirements for personal jurisdiction over a nonresident defendant are set forth in Rule 4.2(a)(2), A.R.Civ.P.:
"Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
"....
"(I) otherwise having some minimum contacts with this state, and under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."
Service of process under Rule 4.2(a)(2) has been held to be as far-reaching as due process permits. DeSotacho, Inc. v. Valnit Indus., 350 So.2d 447, 449 (Ala. 1977). The constitutional guaranty of due process precludes a court from asserting jurisdiction over a defendant unless the defendant has sufficient contacts with the forum state. Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir.1990). The court may exercise either "general" or "specific" jurisdiction over a nonresident defendant. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 nn. 8-9, 104 S.Ct. 1868, 1872 nn. 8-9, 80 L.Ed.2d 404 (1984). General jurisdiction applies where a defendant's activities in the state are "substantial" and "continuous and systematic," *884 even if the cause of action is unrelated to those activities. Data Disc, Inc. v. Systems Tech. Assoc., 557 F.2d 1280, 1287 (9th Cir.1977). Where general jurisdiction does not exist, a court may still exercise specific jurisdiction if the defendant has sufficient contacts with the forum state in relation to the cause of action.
In a particular case, the kind of jurisdiction obtained depends upon the nature and the quality of the contacts, but in any case it is essential that there be some act by which the defendant purposely avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). It is the defendant's contacts with the forum state and not his contacts with the plaintiff that are relevant. Lakeside Bridge & Steel Co. v. Mountain State Construction Co., 597 F.2d 596 (7th Cir. 1979), cert. denied, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980), cited in Sporting Goods Distributors, Inc. v. Whitney, 498 F.Supp. 1088, 1091 (N.D.Fla.1980).
Also, in considering whether a trial court has personal jurisdiction in a contract case, we recognize that a contract is
"`ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' It is these factorsprior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealingthat must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum."
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).
Murray, a Florida resident, contacted Alfab for the purpose of selling SMCI, a Florida corporation. Murray visited Alfab in Enterprise on several occasions for the purpose of negotiating the contract to sell SMCI to Alfab. The parties agreed that Alabama law would govern the interpretation of the contract. We hold that this purposeful solicitation of Alfab in Alabama, the negotiation of the contract in Alabama, and the selection of Alabama law are sufficient contacts with this State to give the trial court personal jurisdiction over Murray.

II.
The second and larger issue raised by Murray is whether the trial court's judgment is flawed. He alleges that the trial court, in reaching its decision, erroneously considered parol evidence regarding the "net worth" of the company, and, finding the net worth to be less than that set out in the contract, found, likewise, that the purchase price was less than that set out in the contract. Alfab, on the other hand, contends that the trial court properly considered parol evidence to determine the intent of the parties in order to interpret the contract.
The trial court entered a judgment giving the entire escrow account to Alfab and awarding Alfab an additional sum of $236,316.00 from Murray. This sum is the amount asked for by Alfab, and it was derived from the following calculations:

"Beginning Balance per 1/31/86
"Review Statement $1,209,776
"Less Adjustments
 "Per Special Statement $377,067
 "Per Aged Accounts Receivable 36,971
 "Per Unrecorded Insurance Claim 93,515
 "Per Expenses on Insurance Claim Settlement 27,553
 ________
 "Total $535,106
"Plus Adjustment
 "Per Tax Settlement 101,971
 ________
 "Net Adjustment (433,135)
 _________

*885
"Equity Per Agreement $ 776,641
"Less Classification Error in Accounts 76,566
 _________
"Equity 1/31/86 $ 700,075
"Adjustment Required
 "Base Equity 1,244,673
 _________
"Net Downward Adjustment to Purchase Price Balance $ 544,598
"Amount Due Purchasers
"Refund of Escrow Funds 249,203
"Settlement AgreementSolomons 59,079
 _________
 "Total $ 308,282
 _________
"Net Amount Remaining $ 236,316"

Murray challenges the following items figured in the trial court's calculations: (1) the adjustments per the special statement; (2) the adjustment for aged accounts receivable; (3) the adjustments related to the claims from Lincoln; and (4) the amount from escrow, which was not apportioned among the shareholders.
The trial court, hearing ore tenus evidence, decided this case without a jury; therefore, the ore tenus rule applies to the trial court's findings of fact. Under the ore tenus rule, when the trial court hears disputed evidence without a jury, "its findings of fact will not be disturbed on appeal unless clearly erroneous, or manifestly unjust." Leslie v. Pine Crest Homes, Inc., 388 So.2d 178, 181 (Ala.1980).
"When the trial court hears ore tenus evidence and makes findings of fact based on that evidence, we presume that the trial court's judgment based on those findings is correct, and it will be reversed only if it is found to be plainly and palpably wrong, after a consideration of all the evidence and after making all the inferences that can be logically made from the evidence. Adams v. Boan, 559 So.2d 1084, 1086 (Ala.1990); Pilalas v. Baldwin County Savings & Loan Association, 549 So.2d 92, 95 (Ala.1989); King v. Travelers Ins. Co., 513 So.2d 1023, 1026 (Ala.1987). In other words, the trial court's judgment will be affirmed if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment. Adams v. Boan, supra; Clark v. Albertville Nursing Home, Inc., 545 So.2d 9 (Ala.1989); McCrary v. Butler, 540 So.2d 736, 739 (Ala.1989)."
Hollis v. Cameron, 572 So.2d 439, 440 (Ala. 1990).

A. Adjustment per special statement

The contract states that the purchase price was $2,249,203.00, subject to certain adjustments specified in the contract. The contract stated that the purchase price was subject to the following adjustments:
"SMCI must have a net worth on January 31, 1986, of $1,244,673.00, represented by a review financial statement prepared by Baumann, Fabricant & Co., P.A., Certified Public Accountants, as of January 31, 1986. The purchase price is to be increased or decreased dollar for dollar respecting any change therein as of January 31, 1986."
The only review statement in the record is dated April 4, 1986. Therefore, for the purposes of increasing or decreasing the purchase price due to changes in the "net worth" of SMCI, the "net worth" of the company on January 31, 1986, was $1,209,776.00, the amount reflected on the April 4, 1986, review statement. Alfab argues that the "net worth" of SMCI was, by the terms of the contract, a fact question, and that that question thus was properly determined by the trial court. We do not agree that *886 the contract terms made "net worth" a fact question.
"If a contract in its terms is plain and free from ambiguity, there is no room for construction, and it is the duty of the court to enforce it as written." McDonald v. U.S. Die Casting & Development Co., 541 So.2d 1064, 1068 (Ala.1989). Although the intent of the parties controls in construing a written contract, the law of contracts is premised upon an objective, rather than subjective, manifestation of that intent. Lilley v. Gonzales, 417 So.2d 161 (Ala.1982). The objective intent of the parties is to be derived from the contract itself, where the language is plain and unambiguous. Trimble v. Todd, 510 So.2d 810 (Ala.1987); Southern Housing Partnerships, Inc. v. Stowers Management Co., 494 So.2d 44 (Ala.1986).
The contract clearly states that the net worth is that amount reflected in the financial review statement from Baumann, Fabricant. The objective intent of this provision was to set up a mechanism for arriving at the price.
"It is not, therefore, necessary that the price should be fixed by the contract itself, or at the very time the contract is made, provided that the parties have settled upon some method by which the price may be determined with certainty. `If the parties settle between themselves some method by which it may be ascertained at a future period, the maxim id certum est quod certum reddi potest ["That is certain which can be made certain"] applies, and the price when so settled shall relate to the original contract.'"
1 F. Mechem, The Law of Sale of Personal Property § 210 (1901). Where the parties to a contract, before dispute and in order to avoid one, provide for a method of ascertaining the value of something related to their dealings, the provision is one for an appraisement. 5 Am.Jur.2d, Arbitration and Award § 3 (1962).
"Such an appraisal or evaluation product which the parties have made contractually conclusive upon themselves is therefore, equally with an arbitration result, not open to escape by either of them, except where it is capable of impeachment `for fraud, or such mistake as would imply bad faith, or a failure to exercise honest judgment.'"
Sanitary Farm Dairies, Inc. v. Gammel, 195 F.2d 106, 113-14 (8th Cir.1952).
The Sanitary Farm Dairies case concerned Sanitary Farm Dairies' contract to repurchase, at the plaintiff's option, his shares in the company at a sum equal to 12 times the net earnings per share of stock for the preceding 12 months. The contract stated that the accounting firm of Ernst & Ernst was to be retained and hired for the purpose of auditing all books and records for the purpose of ascertaining and determining the net earnings per share. The contract also provided that the audit was to be conclusive as to the price of the shares. The plaintiff challenged the audit's finding on various grounds, including claims that it should have been computed on earnings before tax deductions. He brought suit to have the trial court determine the earnings of the corporation as an open accounting matter.
On appeal, the Eighth Circuit Court of Appeals held that in this type of situation, where the ultimate purchase price is based upon the determination of an independent appraiser,
"whatever room there existed for reasonable difference in accountancy views or in accountants' opinion and judgment, choice of method and extent of testing, verifying or proving in the auditing task involved was such a matter [that] the parties had contracted to entrust to Ernst & Ernst's professional skill, judgment and discretion as any other factor inherent in producing an accounting-appraisal result. Judicially, therefore, the question was not whether the court or another accountant individually might think that some aspect of the processes employed by Ernst & Ernst should have been different, but whether what they did was subject to being regarded professionally as not constituting proper accounting practice in a responsible accountancy *887 determination of the corporation's earnings."
Id. at 115.
Following that rationale, we conclude that the questions regarding whether the review statement of April 4 should constitute the mechanism for establishing the purchase price should address whether the review statement was subject to being regarded professionally as not constituting proper accounting practice in a responsible accountancy determination of SMCI's net worth, and not whether another accountant might think some aspect of the process employed by Baumann, Fabricant should have been different.
The engagement letter from Baumann, Fabricant to Alfab stated as follows:
"This letter will confirm our understanding of the arrangements made by you to review the balance sheet of Specialty Maintenance & Construction, Inc. The review is made in conjunction with the potential purchase of Specialty Maintenance & Construction, Inc. by Alfab, Inc.
"We will review the balance sheet of [SMCI] as of January 31, 1986 in accordance with standards established by the American Institute of Certified Public Accountants. We will not perform an audit of such financial statement, the objective of which is the expression of an opinion regarding the financial statements taken as a whole, and, accordingly, we will not express such an opinion on them. Our report on this financial statement is presently expected to read as follows:
"We have reviewed the accompanying balance sheet of [SMCI] as of January 31, 1986, in accordance with standards established by the American Institute of Certified Public Accountants. All information included in these financial statements is the representation of the management of [SMCI].
"A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.
"Based on our review, we are not aware of any material modifications that should be made to the accompanying balance sheet in order for it to be in conformity with generally accepted accounting principles.
"If, for any reason, we are unable to complete our review of your financial statements, we will not issue a report on such statements as a result of this engagement.
"It must be recognized that the usual unrestricted examination of financial statements is not designed to disclose defalcations and irregularities and cannot be relied upon for these purposes. There is much less likelihood of their discovery in an engagement such as this, where no audit is undertaken.
"In addition to the above described review procedures we will perform the following:
"1. Obtain a schedule of in-process jobs at January 31, 1986 and perform the following:
"a. Verify correctness of over/under billing calculation
"b. For larger jobs on this schedule perform the following:
"determine causes and reasonableness of large over or under billed positions
"compare gross profits and percent complete to those at October 31, 1985, investigating large or unusual variations
"obtain details of unapproved change orders and discuss with management approval status
"discuss with management job status, with emphasis on job completion within budgeted amounts and times.
"2. Obtain a schedule of activity between [SMCI] and related parties for the period October 31, 1985 to January 31, 1986 and perform the following:

*888 "a. Compare to activity during the year ended October 31, 1985investigating large or unusual variations.
"b. Review with management, realization of amounts due to [SMCI] at January 31, 1986.
"Upon completion of the above procedures, we will issue a separate report detailing the above procedures and the results of our work. This report will be limited to your use and cannot be used by any other parties."
There is no evidence in the record that the review financial statement was not the product of proper accounting practice in a responsible accountancy determination of the corporation's net worth. Also, there is no testimony that it was not conducted in accordance with the letter quoted above, which outlined the process to be employed.
The letter was received by Robert Sanford, representing Alfab, and he indicated his agreement with the terms of the review by signing and returning to Baumann, Fabricant a copy of the letter. Some time after the review financial statement was prepared and distributed to the parties, Barr requested that certain adjustments to the review statement be made regarding the work-in-progress accounts.
This additional information was provided to SMCI, with the notice that the new report was for the information of SMCI and was "not to be referred to or distributed for any purpose or to anyone who is not a member of management of SMCI." The report was based upon the representations of SMCI and Alfab officers. The following were the procedures Baumann, Fabricant was asked to perform;
"Contracts were reviewed with respect to major covenants and original contracts amounts were agreed to job cost details.
"Open change orders during the period reviewed and compared to those change orders settled to determine whether or not increases in contract amounts were appropriate and realization reasonable.
"Contract billings were reviewed to determine contract compliance, and that amounts billed have been collected or expect to be collected.
"The build-up of costs-to-date was reviewed by examination of supporting documents as to job distribution and amounts. This information was traced from supporting documents to the individual job cost details.
"Estimated costs-to-complete were reviewed with job sponsors, contract administrator, company controller, and other management personnel, as deemed appropriate, to determine that the estimated cost-to-complete and anticipated gross profits are reasonable."
The report represented the adjustments to the work in progress accounts as of July 31, 1986. Alfab contends that such adjustments were necessary to establish the net worth of SMCI and also that such adjustments were allowed for by the language of the contract. We disagree with both arguments.
Alfab appears to argue throughout its brief that the purchase price established by the contract was to be adjusted by the net worth of SMCI on January 31, 1986. The contract's plain terms, however, indicate that such an adjustment was keyed to the net worth of SMCI based upon the review financial statement prepared by Baumann, Fabricant as of January 31, 1986. Therefore, this court will give effect to the plain expressed intention of the parties by determining that the objective manifestation of intent was to be bound by the review financial statement.
As to the second contention, that the contract allowed Alfab to "look back" at the end of six months to the work-inprogress account, we find that contention to be without merit. There was testimony in the record that stated that the work-inprogress accounts, which the parties admit was an estimate in January 1986, were to be reexamined. However, as stated above, this Court is bound by the objective manifestation of intent in a written document. The contract does not allow for a look back at the work-in-progress account and specifically states that the net worth is to be determined by the Baumann, Fabricant review financial statement.
*889 Therefore, we hold that it was error for the trial court to adjust the purchase price regarding this item, as reflected on the special statement, and that, therefore, the adjustment of $377,067.00 was not properly made.

B. Aged Accounts Receivable

Murray argues that, under the terms of the contract, if an accounts receivable item was to be deducted from the escrow account, it was to be returned to the shareholders, Murray and the Solomon brothers. Murray argues that instead of simply charging this item against the escrow account at the end of six months as the contract provided, Alfab and SMCI pursued the matter in court and ultimately recovered less than they had anticipated, thus preventing Murray and the other shareholders from having the opportunity to collect the account. However, the contract provided: "The shareholders of SMCI represent to ALFAB that the accounts receivable of SMCI are accurate, valid and are collectable." Under the evidence the trial court could have found that the item was uncollectable and then could have properly deducted it from the escrow.

C. Insurance Claim

The next item that Murray questions on appeal is the deductions taken for the insurance claims and the expense of the insurance claims. The contract states that the "corporation has paid all obligations due by the corporation to any governmental agency or person, firm or corporation." The trial court could have found that the existence of these claims was such an obligation and, therefore, that the contract was subject to an adjustment for breach of this representation.
Due to the actions, or inactions, of Andrasen, a large deficit accrued in the payment due to Lincoln. The actual amount owed was not determined until sometime after January 31, 1986. The trial court could properly have found that the existence of such a deficit was a breach of the contract provision quoted above.

D. Escrow Fund Share

Murray also argues that the trial court improperly determined the liability of Murray, based not upon his share or interest in the escrow account, but, rather, by considering the entire escrow amount as due to Alfab. The Solomon brothers' share of the escrow was $74,362.16. The Solomon brothers entered a pro tanto settlement with Alfab in which they agreed to release, in favor of Alfab, their interest in the escrow account in return for a dismissal with prejudice from the present action. Because the settlement was pro tanto, any amount deemed to be recoverable by Alfab upon the contract is reduced by the dollar amount of the settlement, which was $74,362.16, the amount of the Solomon's interest in the escrow account.
Based upon the foregoing, we hold that the trial court's judgment was improper and that Murray is entitled to $81,672, which represents his interest in the escrow account after adjustments. Alfab is entitled to a disbursement from the escrow account in the amount of $167,531, the net downward adjustment of the purchase price. The adjusted calculations appear below:

Beginning Balance per 1/31/86
Review Statement (Issued April 4) $1,209,776
Less Adjustments
 Per Aged Accounts Receivable $ 36,971
 Per Unrecorded Insurance Claim 93,515
 Per Expenses on Insurance Claim Settlement 27,553
 ________
 Total $158,039
Plus Adjustment
 Per Tax Settlement 101,971
 ________
 Net Adjustment (56,068)
 __________
Shareholder Equity Less Net Adjustments $1,153,708

*890
Less Classification Error in Accounts $ 76,566
 __________
Adjusted Equity 1/31/86 $1,077,142
Required Base Equity Per Contract 1,244,673
 __________
Net Downward Adjustment to Purchase Price Balance 167,531
Less
Solomons' Interest in the Escrow Account $74,362.16
 __________
Difference Between
Decrease in Purchase Price and Offset of Solomons'
Settlement 93,168.84
Murray's Interest in Escrow Account 174,840.84
 __________
Net Amount of Escrow to be Refunded to Murray $ 81,672.00

III.
Murray also raises an issue regarding the payment to Herbert Barr as escrow agent. Barr, Murray argues, was at all times the agent of Alfab and thus would not be entitled to payment as an escrow agent.
The trial court's original order stated that Alfab's attorney fees and Barr's escrow agent fees were to be paid out of the escrow fund. At the time the trial court so ordered, Alfab had been awarded, in a previous order, the entire escrow fund. Therefore, we hold that the trial court intended Alfab to pay its own attorney fees as well as any fees due Herbert Barr as escrow agent. Those fees would not be properly deductible from that portion of the escrow fund that this Court has held should be paid to Murray.

IV.
Murray also raises the issue of whether Malcolm Scott was an indispensable party. Scott had an interest in the escrow fund of $9,544.49. Scott's interest was allocated out of the 80% of the purchase price payable to Murray. We hold that Scott was not indispensable, because his interest in the escrow fund was tied to Murray's interest. Also, the amount to be refunded to Murray from the escrow fund includes that amount payable to Scott.
Based upon the above, we reverse the judgment of the trial court and remand this cause for the entry of a judgment in accordance with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.

ON APPLICATION FOR REHEARING
INGRAM, Justice.
OPINION MODIFIED; APPLICATION OVERRULED.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.