699 So.2d 138 (1997)
LIBERTY NATIONAL LIFE INSURANCE COMPANY
v.
Talmadge ALLEN.
1950679.
Supreme Court of Alabama.
March 7, 1997.
Rehearing Denied July 11, 1997.
*139 Edgar M. Elliott III, general counsel litigation, Liberty National Life Insurance Company, Birmingham; and Deborah Alley Smith, Rhonda Pitts Chambers, and Sharon Donaldson Stuart of Rives & Peterson, Birmingham, for appellant.
Jonathan H. Waller of Campbell & Waller, L.L.C., Birmingham; and C. Crawford Williams, Jr., of Williams & Ledbetter, Birmingham, for appellee.
MADDOX, Justice.
Talmadge Allen, although he was receiving the benefits payable under a cancer policy issued by Liberty National Life Insurance Company, sued Liberty National, alleging fraud, fraudulent suppression, and bad faith failure to pay an insurance claim. His claims were based on an alleged misrepresentation made by an agent of the insurer that Medicare laws limited the amount of benefits he could receive. At trial, Allen dismissed the fraudulent suppression claim. The jury awarded Allen $40,000 in compensatory damages and $5.4 million in punitive damages. Following a remittitur, the court entered a judgment for the $40,000 and $2.7 million in punitive damages
Liberty National appeals, arguing that the trial judge erred in denying its motion for a summary judgment, its motion for a directed verdict, and then its motion for a judgment notwithstanding the verdict, on both the fraud claim and the bad faith claim. We agree. Reviewing the evidence most favorably to Allen and indulging all inferences that the jury was free to draw, we conclude that Allen did not present substantial evidence in support of his fraud and bad faith claims.

FACTS
Taken in the light most favorable to Allen, the evidence suggests the following facts: Allen holds a family cancer policy issued by Liberty National. He purchased the policy in 1986. In January 1992, he was diagnosed with prostate cancer. He underwent surgery in February 1992 and subsequently received chemotherapy treatments to combat the spread of the disease. Allen's policy covered his losses in the event he contracted cancer, and it allowed up to $500 per day for costs of radiation and chemotherapy treatments. After his chemotherapy treatments began, Allen submitted claims to Liberty National; these claim were promptly paid.
In August 1993, however, Liberty National instituted a new procedure governing the method by which claims on cancer policies like Allen's would be paid to Medicare recipients, and Allen was a Medicare recipient. This new procedure was called the "Medicare Allowable Claims Practice." Under this new procedure, the amount of benefits Liberty National would pay a Medicare participant covered by the cancer policy would be the maximum amount a medical provider was allowed to charge Medicare recipients for the particular treatment.[1]
In September 1993, a year and a half after his surgery, Allen submitted a claim to Liberty National for $2,000 for additional radiation treatments that he had received between July 29 and August 25, 1993. On September 14, 1993, Liberty National sent a letter to Allen explaining that pursuant to the new procedure implemented by Liberty National in August 1993, he needed to file an EOMB form with Liberty National so that it could process his claim. Allen filed the EOMB form with Liberty National on October 7, 1993. On October 12, 1993, Liberty National sent Allen a check for $723.44 and a letter explaining his benefits; this letter stated: "This service [radiation treatments] was covered by Medicare and this provider has *140 agreed that the actual charges will not exceed the amount approved by Medicare." Although Mr. Allen cashed the check, he testified that he remained concerned that he was not receiving the full benefits of his cancer policy. He telephoned Liberty National's customer service line on October 18, 1993. He said that a claims representative, who he identified as "Angie," told him the Medicare Allowable Claims Practice was based on a new law. This representative did not know "which law" this practice was based on. The next day, October 19, Allen wrote Liberty National a letter requesting a detailed breakdown of how his benefits were calculated and a citation to the new law and the date the new law was passed. On October 26, Allen met with Mike Bryant, the claims manager, to discuss his claim and Liberty National's new procedure. At this meeting, Allen told Bryant that the sole reason for his visit was to get a copy of the new law that the Medicare Allowable Claims Practice was based on. Bryant told Allen that he did not have a copy of the new law but that the new procedure was not required by this law. Bryant said the policy was implemented as an interpretation of new Medicare laws.
On November 5, 1993, Liberty National reversed the use of the Medicare Allowable Claims Practice. According to Liberty National, the decision to discontinue this new procedure was based on an increased turnaround time in the payment of claims, administrative delays in processing claims, customer complaints, and a concern for the general litigation environment in Alabama and the cost of potential litigation. Following its reversal of this procedure, Liberty National, through Mike Bryant, wrote Allen a letter informing him of the decision to reverse it and enclosing a check to Allen for $1,334. This amount represented the difference between the $2,000 claim submitted by Allen and the $723.44 he had already received, plus interest. Allen cashed this check, but on May 18, 1994, he sued Liberty National in the Jefferson Circuit Court, alleging fraud, fraudulent suppression, and bad faith, all in relation to Liberty National's processing of his claim for radiation treatments.
At trial, Liberty National moved for a summary judgment on all claims asserted by Allen; the trial court denied its motion. After Allen had completed the presentation of his case, he voluntarily dismissed his claim of fraudulent suppression. Liberty National subsequently moved for a directed verdict on the fraud and bad faith claims; the court denied its motion. After Liberty National had presented its case, it again moved for a directed verdict on the fraud and bad faith claims. The trial judge again denied Liberty National's motion. The jury returned a verdict for Allen, awarding $40,000 in compensatory damages for emotional distress and $5.4 million in punitive damages. Liberty National moved for a JNOV or a new trial; the court denied both, but conditioned its denial of a new trial on Allen's filing a remittitur of $2.7 million. Allen filed the remittitur. The court entered a judgment, and Liberty National appealed.

I.
Liberty National first argues that, as to the fraud claim, the trial court erred by denying its motion for a directed verdict and then later its motion for a judgment notwithstanding the verdict. Allen claims that the alleged misrepresentation occurred when, he says, the claims representative, "Angie," told him that the Medicare Allowable Claims Practice was based on a new law. Liberty National contends that this statement was not actionable because, it says, the evidence clearly shows that Allen did not rely on this representation.
Initially, we note that a motion for a directed verdict is a procedural device by which one party tests the sufficiency of the other party's evidence. See, Rule 50(a), Ala. R. Civ. P.; Alabama Power Co. v. Williams, 570 So.2d 589 (Ala.1990); John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 376 (Ala.1990); J. Hoffman & S. Guin, Alabama Civil Procedure § 8.37 (1990). Similarly, a motion for a JNOV simply "permits the trial court to revisit its earlier ruling denying the motion for directed verdict." Alabama Power Co. v. Williams, supra, at 591. The ultimate question, of course, as to either motion, is whether the nonmovant has presented sufficient *141 evidence to allow submission of the case or issue to the jury for a factual resolution. Hoffman & Guin, supra, at § 8.37. For actions filed after June 11, 1987, the standard of review applicable to a motion for a directed verdict or for a JNOV is the "substantial evidence rule." See, § 12-21-12(a), Ala.Code 1975; Koch v. State Farm Fire & Cas. Co., 565 So.2d 226, 228 (Ala. 1990). Thus, in an action filed after June 11, 1987, a party presenting a claim or a defense must present "substantial evidence"[2] supporting each element of the claim or defense in order to withstand a motion for a directed verdict or for a JNOV. This calls for "a purely objective determination of whether the party having the burden of proof has produced [sufficient] evidence [creating a factual dispute] requiring resolution by the jury." Ex parte Oliver, 532 So.2d 627, 628 (Ala.1988); see also, John R. Cowley & Bros., Inc. v. Brown, supra.
Additionally, in reviewing a motion for a directed verdict or a motion for a JNOV, this Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would be free to draw. Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala.1991).
As this Court has previously stated, "the elements of actionable fraud based on a misrepresentation are: (1) a duty to speak the truth; (2) a false representation of a material existing fact made intentionally, recklessly, or innocently; (3) action by the plaintiff in reliance upon the false representation; and (4) damage proximately resulting from the false representation." Smith v. MBL Life Assurance Corp., 589 So.2d 691, 696 (Ala.1991). See also Salter v. Alfa Ins. Co., 561 So.2d 1050 (Ala.1990). For Allen to sustain his fraud claim, he must show he relied on Liberty National's representation and that he acted on this reliance to his detriment.
What does the evidence show? It shows that on October 18, 1993, Allen telephoned Liberty National's claims representative requesting an explanation of his benefits payment. The representative explained that the new payment procedure was based on requirements of a new law. According to Allen, there was an actionable fraud because this statement was false and, he says, he relied on it to his detriment. Liberty National contends that Allen did not rely on this representation, pointing out that the next day he wrote a letter to Liberty National requesting a copy of the new law; that, in addition, when he met with Bryant, the claims manager, on October 26, 1993, Allen asked for a copy of the new law; and that after Allen made this request Bryant informed Allen that the payment procedure was based on an interpretation of a new law. Liberty National argues that the evidence shows that Allen never believed the alleged representation by the claims representative because, it says, the evidence shows that he constantly questioned the validity of that representation. We agree.
In Smith v. J.H. Berry Realty Co., 528 So.2d 314 (Ala.1988), Smith, who was purchasing a house, asked the realty agent whether the house and the positioning of a fence complied with "applicable regulations." The agent told Smith that they did comply. Before the closing, Smith extensively investigated whether the house actually complied with the building code and zoning regulations. After Smith purchased the house, he learned that it did not comply with a zoning regulation. This Court stated:
"To claim reliance upon a misrepresentation, the allegedly deceived party must have believed it to be true. If it appears that he was in fact so skeptical as to its truth that he placed no confidence in it, it cannot be viewed as a substantial cause of his conduct. Halbrooks v. Jackson, 495 So.2d 591 (Ala.1986); Ex parte Leo, 480 So.2d 572 (Ala.1985). The reliance must be reasonable under all the circumstances of the case. Halbrooks, supra. Compare Bedwell Lumber Co. v. T & T Corp., 386 *142 So.2d 413 (Ala.1980). The undisputed fact that Mr. Smith was unwilling to accept the statement of the defendant's agent without verification is evidence that he did not rely on it. Based on his own testimony, it is clear that Mr. Smith was unwilling to accept the statement of the defendant's agent regarding the applicable zoning regulations."
528 So.2d at 316.
Liberty National contends that the evidence shows that Allen constantly tried to determine what new law had affected his claim and that this fact requires a finding that he did not accept the agent's statement as true. Liberty National thus argues that Allen's fraud claim is without merit because, it says, the evidence shows that he did not rely on the agent's statement. Again, we agree with Liberty National. Viewing the record in the light most favorable to Allen, we find no evidence to demonstrate that Allen relied upon the agent's statement. Even if Allen had presented evidence that he relied on the representation, none of the evidence demonstrates that he acted on his reliance. In order to sustain an action alleging fraud, the plaintiff must prove not only that he or she relied on the representation, but also that he or she acted upon that reliance. Smith v. MBL Life Assurance Corp., supra. Therefore, as to the fraud claim, we hold that the trial court erred in denying Liberty National's motion for a directed verdict and, later, its motion for a judgment notwithstanding the verdict.

II.
As to the bad faith claim, Liberty National also contends that the trial court erred in denying its motion for a directed verdict and, later, its motion for a judgment notwithstanding the verdict. Liberty National argues that Allen did not prove the elements of a bad faith claim.
In National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179 (Ala.1982), this Court stated the elements of the tort of bad faith:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.
"The `debatable reason' under (c) above means an arguable reason, one that is open to dispute or question."
417 So.2d at 183 (emphasis omitted).
Given the elements of a bad faith claim, we are compelled to hold that the trial court erred in denying Liberty National's motion for a directed verdict and, later, its motion for a judgment notwithstanding the verdict. In a bad faith case, the plaintiff's burden is heavy, National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982); Allen failed to carry this burden.
Allen's cancer policy with Liberty National provided:
"Expenses for the treatment of cancer will consist of the actual charges by a hospital, physician, or other provider subject to the limitations contained herein. No benefits will be paid in excess of the reasonable and customary charges made by the provider of the services or treatments."
In order to sustain a bad faith claim, the plaintiff must show the absence of a legitimate or arguable reason authorizing the insurer not to pay. Liberty National contends that the Medicare Allowable Claims Practice was arguably supported when it is read in conjunction with the Medicare law. Liberty *143 National argues that Allen was a Medicare patient and that federal laws have established a Medicare provider's reasonable charge. Liberty National, pointing out that Allen's policy provided that "[n]o benefits will be paid in excess of the reasonable and customary charges," argues that the "reasonable... charges" would be the maximum that a provider could charge a person under the Medicare laws. Liberty National argues that a provider's charges are unreasonable if the provider charges a Medicare patient more than the charge allowed under the Medicare laws. Therefore, Liberty National contends that it had a debatable reason for paying Allen only what was required under the Medicare law.
We agree with Liberty National that it had an arguable reason not to pay above what Medicare law listed as the maximum amount a provider could charge a Medicare recipient. To defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable. This Court has held that "`if any one of the reasons for denial of coverage is at least "arguable" this Court need not look any further,' and a claim for bad faith refusal to pay the claim will not lie." ALFA Mutual Ins. Co. v. Smith, 540 So.2d 691, 695 (Ala.1988), quoting McLaughlin v. Alabama Farm Bureau Mut. Cas. Ins. Co., 437 So.2d 86, 91 (Ala.1983). Because Liberty National had an arguable reason, Allen cannot recover on his bad faith claim. Therefore, as to the bad faith claim, the trial court erred in denying Liberty National's motion for a directed verdict and, later, its motion for a judgment notwithstanding the verdict.
We would also note that the alleged breach of contract was corrected within a two-month period. In September 1993, Allen submitted his claim to Liberty National. On November 11,1993, Liberty National paid the balance of the entire claim submitted by Allen, plus interest. In Harrington v. Guaranty Nat'l Ins. Co., 628 So.2d 323 (Ala.1993), Harrington filed a claim with his insurance company for uninsured motorist benefits. Initially, the insurance company refused to pay. However, two months later, the insurance company did pay the total claim. This Court stated, "We are not persuaded by Harrington's arguments that the delay amounted to a breach of contract." 628 So.2d at 327. Within a month of his claim, Liberty National paid Allen's claim in accordance with its Medicare Allowable Claims Practice. Within two months of the submission of the claim, Liberty National paid the entire balance of the claim, plus interest. Considering the short time between the submission of the claim and Allen's receipt of full payment, we do not find that this delay in time amounted to an intentional failure to pay.
The judgment of the trial court is due to be reversed and the cause remanded.
REVERSED AND REMANDED.
HOUSTON and SEE,[*] JJ., concur.
HOOPER, C.J., concurs specially.
ALMON, J., concurs in the result.
COOK, J., dissents.
SHORES, J., recuses.
HOOPER, Chief Justice (concurring specially).
I concur with Justice Maddox's opinion. Liberty National originally adopted a reasonable practice of paying only that portion of each claim that would be reimbursed by Medicare. Upon discovering that its policyholders were dissatisfied with that practice, but before Talmadge Allen sued, Liberty National reversed that practice. Therefore, Allen suffered no damage, but he still filed this action. In spite of Liberty National's efforts to keep its policyholders happy, it was forced to endure the burden and expense of litigation in this case. I think Liberty National should be commended for accommodating its policyholders like Talmadge Allen. Instead, this needless litigation has forced both the defendant and the State of Alabama to waste valuable time and money.
*144 COOK, Justice (dissenting).
I respectfully dissent. The plaintiff presented a prima facie case of fraud by misrepresentation. Justice Maddox says that the evidence showed that the plaintiff did not detrimentally rely upon the statement by Liberty National's claims representative. I disagree.
To prove a claim of fraud by misrepresentation, a plaintiff must show that the defendant made a misrepresentation of a material fact and that the plaintiff justifiably relied on that misrepresentation to his or her detriment.
Liberty National argues that the plaintiff in this case did not rely on its statement because, it says, he did not accept Liberty National's statement as true, as evidenced by the plaintiff's request for a copy of the "new law." Four Justices agree. Their opinion asserts that no evidence demonstrated that the plaintiff relied upon Liberty National's statement. Even if the plaintiff did rely on the statement, according to Justice Maddox's opinion he did not act upon his reliance. I disagree.
On October 12, 1993, Liberty National sent a check for $723.44 to the plaintiff, attaching a letter that read in pertinent part: "This service [radiation treatment] was covered by Medicare and this provider has agreed that the actual charges will not exceed the amount approved by Medicare." In substance, this letter from Liberty National informed the plaintiff that $723.44, the amount of the check, was the full and final amount Liberty National would pay him on his $2,000 radiation bill. The plaintiff accepted this letter as the truth. Therefore, acting in reliance on Liberty National's statement in the letter, the plaintiff cashed the $723.44 check. These facts reasonably support a finding of detrimental reliance by the plaintiff, thereby establishing a prima facie case of fraud.
Justice Maddox relies on Smith v. J.H. Berry Realty Co., 528 So.2d 314 (Ala.1988), in which we held that "[t]o claim reliance upon a misrepresentation, the allegedly deceived party must have believed it to be true." Id. at 316. However, Smith is easily distinguishable from the instant case. In Smith, the plaintiff sued a realty company for fraud after being wrongly told by an agent that the house he was about to purchase was in compliance with zoning regulations. Id. at 314. Wishing to satisfy his own mind before he purchased the house, the plaintiff extensively investigated the zoning guidelines and asked to see the building code. Id. at 315. After purchasing the house, the plaintiff was told that the house did not comply with zoning regulations. Id. at 316. The plaintiff then sued, alleging fraud. We held that the evidence showed that the plaintiff had not relied on the statement regarding the zoning regulations as being the truth, because it showed that he extensively investigated the regulations before he purchased the home. Id. at 316. Obviously, the plaintiff in Smith was apprehensive before he purchased the house, even after he was told by the building inspector and the realty agent that the house was in compliance. Therefore, he investigated the regulations before purchasing; the evidence showed that he did not rely on the realtor's statement.
However, unlike the plaintiff in Smith, the plaintiff in the instant case requested a copy of the "new law" after Liberty National's agent made the statement and after he had cashed the check in reliance on this statement. The plaintiff inquired into the "new law" so that he could protest changes in the Medicare law by writing his representative in Congress. (R.T. 471-72.) The plaintiff testified, "That new law really blew my mind...." (R.T. 459.) He continued by stating, "It concerned me greatly sir, that this new law hadas it had been told to me, had been passed and it was going to affect benefits of me as an elderly person." (R.T. 518.) It was not that the plaintiff did not rely upon Liberty National's statement to his detriment; he did. The evidence indicates that the plaintiff simply sought to obtain from Liberty National information about this law so that he could express his dissatisfaction.
Because I find substantial evidence from which the jury could have properly found that the plaintiff detrimentally relied on Liberty National's representation, I do not reach *145 a judgment as to other issues raised in the defendant's briefs.
NOTES
[1] Under the Medicare laws, Medicare sets the maximum amount a Medicare recipient can be charged for treatments performed by a medical provider. An "Explanation of Medicare Benefits" ("EOMB") form, which is provided to the Medicare recipient in Alabama by Blue Cross and Blue Shield, documents the maximum charges allowed. The amount Medicare sets as the maximum amount that can be charged to a Medicare recipient for the specific treatment is the maximum amount Medicare will pay for that treatment.
[2] "Substantial evidence" has been defined as "evidence of such weight and quality that fairminded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12.
[*] Justice See did not sit for the oral arguments in this case, but he listened to the tapes of the oral arguments.