Hunt Petroleum Corporation appeals from a judgment entered against it and in favor of the State of Alabama awarding the State $3,403,200 in compensatory damages[2] and $20,000,000 in punitive damages on the State's fraud claims. The State's fraud claims were based on alleged misrepresentations made by Hunt to the State regarding the payment of royalties by Hunt on gas extracted from Mobile Bay pursuant to a lease agreement between the State and Hunt. Hunt argues that the State failed to establish that it relied on the alleged fraudulent misrepresentations, and that, therefore, the State failed to establish a necessary element of fraud. Therefore, Hunt argues, the trial court erred when it denied Hunt's motion for a judgment as a matter of law ("JML"). We reverse and remand.
 I.
In 1984, Exxon Corporation and Hunt Petroleum Corporation entered into a joint venture to extract gas and gas byproducts ("gas") from Mobile Bay.[3] In that same year, Exxon and Hunt entered into a lease agreement with the State, pursuant to which they leased the oil-and-gas rights to certain sections of Mobile Bay. In consideration for the right to extract and sell the gas, Exxon and Hunt made an initial payment to the State of Alabama of more than $52 million and also agreed to pay certain royalties based on the amount of gas successfully produced by drilling wells in Mobile Bay. The relevant provision of the lease agreement provides:
 "5. When production of oil, gas or any other liquid or gaseous hydrocarbon mineral from the leased area is obtained, [Hunt] agrees to pay [the State], during the time hereof, the following royalties:
 "(a) The value of . . . 25% of the gross proceeds
from oil, distillate, condensate, gas, natural gasoline or other product covered by the lease, produced and sold from the leased area at the price received therefor or at the best price realizable in the exercise of reasonable diligence, whichever is higher. . . ."
(Emphasis added.) Hunt and the State dispute the proper point in the extraction process at which the gas should have been valued, that is, the point at which "gross proceeds" should have been calculated; this litigation is the result of that dispute.
Hunt interpreted the lease agreement to obligate it to pay royalties based on the value of the gas at the point of extraction, that is, at the wellhead. This interpretation of the lease agreement allowed Hunt to deduct from the sale price of the gas (1) the costs it incurred in transporting the gas to an onshore treatment plant, (2) the costs of transforming the gas at the treatment plant into a commercially salable product, and (3) the costs of transporting the transformed gas from the treatment plant (the point at which the gas leaves the treatment plant is referred to as "the tailgate") to a pipeline for final sale. *Page 3 
The State agreed that Hunt could deduct from the sale price the cost of transporting the gas from the treatment plant to the pipeline for final sale, but disputed the deductions Hunt took (1) for transporting the gas from the wellhead to the treatment plant and (2) for transforming the gas into its final form. Thus, the State took the position that royalties were due on the value of the gas "at the tailgate."
While the State interprets the term "gross proceeds" as used in the lease agreement to mean revenue "at the tailgate," net of transportation costs from the tailgate to a pipeline, Hunt acted in accordance with its interpretation of the lease agreement and, each month, reported royalties to the State based on the value of the gas produced "at the wellhead."[4] Hunt thus took the position that the term "gross proceeds" as used in the lease agreement means revenue not only net of the costs of transporting the gas from the tailgate to a pipeline for final sale, but also net of the transportation costs from the wellhead to the treatment plant and the costs of treating the gas. Thus, the contract question presented was what was deducted from the "gross proceeds" as that term was used in the lease agreement.
Before trial, the State moved for a partial summary judgment on the breach-of-contract claim. The trial court granted the motion and adjudged Hunt liable for breach of contract. Therefore, the State's interpretation of the lease agreement had been established as the correct interpretation and that issue was not before the jury.
At trial, the State pursued its fraud claim against Hunt. The State argued that Hunt had sent it over 100 monthly reports in which Hunt misrepresented the amount of the royalties Hunt owed the State on the gas it had extracted from its wells in Mobile Bay. The State argued that each of those monthly royalty reports fraudulently misrepresented that "net proceeds" were "gross proceeds" under the lease agreement and that the State was therefore entitled not only to damages for breach of contract, but also to damages for fraud. The jury returned a verdict in favor of the State and against Hunt and awarded the State $3,403,200 in compensatory damages and $20,000,000 in punitive damages. Hunt moved the trial court for a JML, or, in the alternative, for a remittitur. The trial court denied Hunt's motions; Hunt appealed.
 II.
On appeal, Hunt argues (1) that the trial court erred in failing to grant its motion for a JML on the State's fraud claims and (2) that, even if we conclude that the trial court did not err in denying Hunt's motion for a JML, the punitive-damages award must be vacated or reduced to comport with statutory and constitutional limitations.[5] In Alabama Power Co. v.Aldridge, 854 So.2d 554, 560 (Ala. 2002), we stated the standard of review applicable to a ruling on a motion for a JML:
 "We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is `indistinguishable from the standard by which we review a summary judgment.' Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination. *Page 4 City of Birmingham v. Sutherland, 834 So.2d 755
(Ala. 2002)."
In Robbins v. Sanders, 890 So.2d 998, 1016 (Ala. 2004), we stated that "[p]unitive-damages awards are subject to a de novo standard of review."
 III.
Hunt argues that the trial court erred in failing to grant its motion for a JML on the State's fraud claims because, it says, the State failed to establish that the State relied on the alleged misrepresentations made by Hunt. The law of fraud is well-settled. "An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation." Waddell Reed, Inc. v. United InvestorsLife Ins. Co., 875 So.2d 1143, 1160 (Ala. 2003). Section6-5-101, Ala. Code 1975, provides that "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party . . . constitute legal fraud." Thus, reliance in the form that the misrepresentation is "acted on by the opposite party" is an essential element of fraud in Alabama. Liberty Nat'l Life Ins.Co. v. Allen, 699 So.2d 138, 141 (Ala. 1997).
Moreover, the burden is on the party alleging fraud to prove by substantial evidence the element of reliance. Allstate Ins. Co.v. Eskridge, 823 So.2d 1254, 1264 (Ala. 2001). "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). See also § 12-21-12, Ala. Code 1975; Thomas v. PrincipalFin. Group, 566 So.2d 735, 738 (Ala. 1990). Evidence that amounts to "mere speculation, conjecture, or guess" does not rise to the level of substantial evidence. Charles W. Gamble,McElroy's Alabama Evidence § 448.01 (1991) (citing Smoyer v.Birmingham Area Chamber of Commerce, 517 So.2d 585 (Ala. 1987), and Sprayberry v. First Nat'l Bank, 465 So.2d 1111 (Ala. 1984)).
Reliance requires that the misrepresentation actually induced the injured party to change its course of action. SeeRestatement (Second) of Torts § 537 (1977) ("The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if . . . he relies on the misrepresentation in acting or refraining from action, and . . . his reliance is justifiable."); 9 Stuart M. Speiser et al.,The American Law of Torts § 32:49 (Clark Boardman Callaghan 1992) ("It is a fundamental principle of the law of fraud throughout the United States, regardless of the form of relief sought, that in order to secure redress, the representee (person to whom or which the misrepresentation was made) must have relied upon the statement or representation as an inducement to his action or injurious change of position.").
This Court has explained what constitutes legal reliance in Alabama:
 "`To determine whether or not a misrepresentation was actually relied upon, whether it was a cause in fact of the damage, the sine qua non rule is often applied. If the plaintiff would not have acted on the transaction in question but for the misrepresentation, such misrepresentation was an actual cause of his loss. If he would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor.'"
Shades Ridge Holding Co. v. Cobbs, Allen Hall Mortgage Co.,390 So.2d 601, 611 *Page 5 
(Ala. 1980) (quoting Fowler V. Harper and Fleming James, Jr.,The Law of Torts § 7.13 (1956)). See also Fisher v. ComerPlantation, Inc., 772 So.2d 455, 466 (Ala. 2000) ("When deciding whether the plaintiff relied on a misrepresentation, the fact-finder must consider whether the plaintiff would have chosen a different course but for the suppression of a material fact."). Other states have adopted similar tests.
The Supreme Court of Kansas explained reliance in Nichols v.Kansas Political Action Comm., 270 Kan. 37, 53, 11 P.3d 1134,1146 (2000):
 "`It is an elementary rule of the law of fraud, regardless of the form of relief sought, that in order to secure redress because of false representations it is not enough to show merely that they were material, that they were known to be false and that they were made with intent to deceive, but it must also be shown that they did actually mislead and deceive, or, in other words, that they were relied upon by the complaining party to his detriment. Where a plaintiff seeks to recover because of the fraud of the defendants, based upon false representations, it is incumbent upon him to allege and prove what representations were made, that they were false, that he believed them to be true, and that he relied and acted upon them to his detriment.'"
(Quoting Todd v. Wichita Fed. Sav. Loan Ass'n, 184 Kan. 492,495, 337 P.2d 648, 650 (1959) (emphasis added).) See also, e.g.,McManus v. American Express Tax and Bus. Servs., Inc.,67 F.Supp.2d 1083, 1089 (D.Ariz. 1999) ("`Reliance might, for fraud purposes, be defined as a belief which motivates an act.'") (quoting Berry v. Robotka, 9 Ariz.App. 461, 453 P.2d 972, 979
(1969)); United Parcel Serv. Co. v. Rickert, 996 S.W.2d 464,469 (Ky. 1999) ("In Kentucky, a claimant may establish detrimental reliance in a fraud action when he acts or fails to act due to fraudulent misrepresentations."); St. Paul Fire Marine Ins. Co. v. Russo Bros., 641 A.2d 1297, 1299 n. 2 (R.I. 1994) ("It is further fundamental that a plaintiff must present evidence that shows he or she was induced to act because of the reliance upon the alleged false representation."); McKinstry v.Valley Obstetrics-Gynecology Clinic, P.C., 428 Mich. 167, 187,405 N.W.2d 88, 97 (1987) ("To establish either fraudulent or an innocent misrepresentation, a party must demonstrate that he acted in reliance upon the alleged misrepresentation."); Luscherv. Empkey, 206 Neb. 572, 576, 293 N.W.2d 866, 868 (1980) ("In order to recover for fraud, a party must have acted on the other party's misrepresentations. The test of whether he relied thereon is generally whether he would have acted in the absence of the representations. If he would have acted in the same way even in the absence of the representation, then he has not relied thereon."); Klemow v. Time, Inc., 466 Pa. 189, 197 n. 17,352 A.2d 12, 16 n. 17 (1976) ("The successful maintenance of a cause of action for fraud includes, inter alia, a showing that the plaintiff acted in reliance on the defendant's misrepresentations."); Peters v. Kell, 12 Wis.2d 32, 42,106 N.W.2d 407, 414 (1960) ("A false representation must be relied and acted upon in order to be actionable.").
Although the terminology varies from state to state, the underlying principle is the same — for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation.
The State has failed to meet its burden of proving by substantial evidence that the State relied on Hunt's alleged misrepresentations. At trial, the only testimony *Page 6 
relevant to the issue of reliance came from James Griggs, State Lands Director for the Department of Conservation and Natural Resources. He testified that when the State received the royalty reports from Hunt it believed Hunt was correctly calculating the royalties according to the State's interpretation of the lease agreement. He testified:
 "[W]hen we received the reports we assumed these reports were accurate. We deposited the funds. We allowed [Hunt] to use the gas that [it] had reported [it] produced. We allowed [Hunt] to sell the gas.
 "We took those funds and we made what we know now to be an erroneous assumption that they were correct and we made projections for budgets. The [S]tate of Alabama always — as everyone knows, we make annual projections on revenues coming into the state. So we relied on those as being correct reports and we — we made every assumption that they were correct."
The evidence does not, in fact, support the bald assertion that the State "assumed" that the reports Hunt generated were accurate. It was understood when the lease agreement was signed in 1984 that the State would at some point audit Hunt's records to determine whether its calculation of royalties was correct. This is evident from the testimony of Robert Macrory, the former head of the legal division of the Department of Conservation and Natural Resources and the attorney who drafted the lease agreement:
 "Q [Hunt's counsel]: Now, there isn't any question in your mind, is it, Mr. Macrory, that there was going to be an audit of all of the five oil companies or oil interests out there in Mobile Bay as to their leases?
"A: There was never any question in my mind, no, sir.
 "Q: Or anybody up at the Department of Conservation, was it?
 "A: I can't speak for them, but I would have to assume not.
 "Q: I mean, everybody knew that that was one thing you were going to do for sure is check on the audit, wasn't it?
"A: Yes, sir.
 "Q: And it's a cumulative process, isn't it; that is, the auditor goes out and in, let's say, Hunt's case, first production was in November of 1993 to December of 1996, and that was what the audit first covered, wasn't it?
"A: I believe so, yes, sir.
 "Q: Okay. And then when the auditor came back, he started right there in January of 1997, and it goes forward to 19 — December of 1998, doesn't it?
"A: Yes, or 1999. I'm not sure which year, yes, sir.
 "Q: My point is, it's cumulative. It's not like they just come in and check one little period. They look at the whole, the stream of business done from — since the last audit?
 "A: You would expect to continue the audit process so long as there is production generating royalty payments, yes.
 "Q: Right. And that's something well known by everybody, isn't it?
"A: Yes."
It is clear that from the time the State entered into the lease agreement with Hunt it intended to audit the royalty calculations. If the State merely "assumed" that the calculations were correct, there would have been no need for an audit. Nor was the audit merely a conceptual *Page 7 
possibility; as Macrory testified, "[t]here was never any question in my mind [that the royalty calculations would be audited], no, sir." The fact that the State always planned to audit Hunt indicates that the State did not simply "assume" that the royalty reports were correct.
In Allen, we summarized Smith v. J.H. Berry Realty Co.,528 So.2d 314 (Ala. 1988):
 ". . . Smith, who was purchasing a house, asked the realty agent whether the house and the positioning of a fence complied with `applicable regulations.' The agent told Smith that they did comply. Before the closing, Smith extensively investigated whether the house actually complied with the building code and zoning regulations. After Smith purchased the house, he learned that it did not comply with a zoning regulation. This Court stated:
 "`To claim reliance upon a misrepresentation, the allegedly deceived party must have believed it to be true. If it appears that he was in fact so skeptical as to its truth that he placed no confidence in it, it cannot be viewed as a substantial cause of his conduct. The reliance must be reasonable under all the circumstances of the case. The undisputed fact that Mr. Smith was unwilling to accept the statement of the defendant's agent without verification is evidence that he did not rely on it. Based on his own testimony, it is clear that Mr. Smith was unwilling to accept the statement of the defendant's agent regarding the applicable zoning regulations.'
"[Smith], 528 So.2d at 316."
699 So.2d at 141 (citations omitted; emphasis added). It is undisputed that the State in the case before us, like Mr. Smith in Smith v. J.H. Berry Realty Co.,"was unwilling to accept the statement[s] of [Hunt] without verification." 528 So.2d at 316. In the case before us, that verification was to take the form of an audit. The State always intended to obtain that verification, and it did in fact audit the gas production and the royalty payments.
However, even if we were to accept the State's argument that it "assumed" that the monthly royalty reports generated by Hunt were correct, that assumption does not constitute legal reliance. As we stated in Allen, 699 So.2d at 142, "[i]n order to sustain an action alleging fraud, the plaintiff must prove not only that he or she relied on the representation, but also that he or she acted upon that reliance." Although the State has claimed that it depended on Hunt to calculate the royalty payments and that it trusted that Hunt's calculations were correct, it has failed to present any evidence, much less substantial evidence, indicating that the State would have done anything other than "adopt the same course" had the monthly reports generated by Hunt actually comported with the State's interpretation of the lease agreement.Shades Ridge, 390 So.2d at 611.
In fact, the evidence indicates that the State's course of action would have been the same even had the monthly reports been correct according to the State's interpretation of the lease agreement. The State began accepting monthly royalty reports and monthly royalty payments from Hunt in late 1993. Griggs offered the following as the only evidence of any kind of reliance on those reports:
 "[W]hen we received the reports we assumed these reports were accurate. We deposited the funds. We allowed [Hunt] to use the gas that [it] had reported [it] produced. We allowed [Hunt] to sell the gas.
 "We took those funds and we made what we know now to be an erroneous assumption *Page 8 
that they were correct and we made projections for budgets."
Griggs does not state what course the State would have followed had it known that the reports were not consistent with what became the State's interpretation of the lease agreement. We might speculate[6] that the State would have returned the proffered checks and prohibited Hunt from selling the gas. However, the State's actual practice belies such speculation.
After the State decided in August 1997 that the royalty amounts Hunt was reporting were incorrect, it wrote Hunt that it interpreted the lease agreement to require payments based on the price at the tailgate, and Hunt wrote back explaining its disagreement with the State's interpretation. Thereafter, the State continued to accept the monthly royalty checks and to allow Hunt to sell the gas. The only evidence of the effect of the monthly royalty reports on the State's conduct after August 1997 when the State realized the reports were inaccurate is that the State "adopted the same course," that is, it accepted the checks and allowed Hunt to sell the gas exactly as Griggs testified the State did with the reports it had "assumed" were accurate. Indeed, the State makes no argument that it would have altered its course had Hunt correctly reported the royalties.[7]
The State's claim that it relied on the monthly royalty reports submitted by Hunt for its budget projections is undermined by the fact that there is no evidence in the record indicating that anyone employed by the State ever looked at those reports. In oral argument before this Court, the attorney for the State admitted as much:
 "Q [by Justice Woodall]: [W]hat evidence did the State put on about what the State actually did with these reports that formed the basis of the fraud claim?
 "A: There is not a witness, Justice Woodall, who took the stand and testified upon receipt of this document we put it in this file cabinet or analyzed it."
In fact, at trial, Robert Macrory, the former head of the legal division of the Department of Conservation and Natural Resources and the attorney who drafted the lease agreement, admitted that he did not see the royalty reports until after this litigation began.
At oral argument, when the attorney for the State was further pressed for evidence of the State's reliance on the royalty reports it alleged were incorrect, he cited the testimony of Griggs, the only State employee other than Macrory to testify:
 "We took those funds and we made what we know now to be an erroneous assumption that they were correct and we made projections for budgets."
Significantly, Griggs did not testify that the budget projections made by the State would have been any different had the State known that the royalty reports reflected not the amount of royalty payments the State believed it was due, but rather, the amount Hunt argued the State was *Page 9 
due. Indeed, there is no evidence in the record indicating that once the State determined that the reports understated the royalties the State began to increase, or otherwise altered, its budget projections.
In the absence of evidence indicating that the State looked at the monthly royalty reports, we can only speculate as to what the State might have done if the reports had contained different information. However, "mere speculation, conjecture, or guess" does not rise to the level of substantial evidence. McElroy'sAlabama Evidence § 448.01 (citing Smoyer v. Birmingham AreaChamber of Commerce, 517 So.2d 585 (Ala. 1987), and Sprayberryv. First Nat'l Bank, 465 So.2d 1111 (Ala. 1984)).
There is no evidence indicating that the alleged misrepresentations by Hunt caused the State to adopt a course of action any different from the one it would have chosen to follow absent the misrepresentations; therefore, the State did not meet its burden of proving by substantial evidence that it relied to its detriment on the monthly royalty reports submitted by Hunt. Without reliance, there can be no fraud.[8] We therefore reverse the trial court's order denying Hunt's motion for a JML and remand the case for the trial court to enter a JML in favor of Hunt on the fraud claims. Our resolution of this issue pretermits our consideration of Hunt's argument regarding the punitive-damages award.
REVERSED AND REMANDED.
BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON, J., concurs specially.
JOHNSTONE, J., dissents.
LYONS, J., recuses himself.
[2] The compensatory damages on the fraud claims duplicate the compensatory damages awarded on the State's breach-of-contract claim, which is not at issue on appeal; therefore, this amount does not represent any compensatory damages above those awarded on the breach-of-contract claim.
[3] Under the contract establishing the joint venture, Exxon was responsible for the actual exploration and production of gas; however, Hunt agreed to pay 25% of all expenses and in return was to receive 25% of the gas produced.
[4] The untreated gas at the wellhead is worth less than the gas once it leaves the tailgate.
[5] Hunt makes no argument as to the summary judgment entered against it on the breach-of-contract claim; therefore, that claim is not before this Court.
[6] "[M]ere speculation, conjecture, or guess" does not rise to the level of substantial evidence. Charles W. Gamble, McElroy'sAlabama Evidence § 448.01 (1991) (citing Smoyer v. BirminghamArea Chamber of Commerce, 517 So.2d 585 (Ala. 1987), andSprayberry v. First Nat'l Bank, 465 So.2d 1111 (Ala. 1984)).
[7] The State has not made the argument that Hunt's incorrect royalty reports caused it to "rely" by compelling it to bring this legal action. If the filing of a lawsuit were sufficient to satisfy the reliance element of a fraud claim, that element would be meaningless, having been met in every case by the filing of a complaint.
[8] The State, citing Braswell v. ConAgra, Inc.,936 F.2d 1169 (11th Cir. 1991), argues that the reliance requirement in a fraud action can be met where a party accepts underpayments from another who has complete control over the payment process. However, although the United States Court of Appeals for the Eleventh Circuit purported to apply Alabama law in Braswell, no Alabama court has adopted this view or has otherwise excused a party from satisfying the statutory and common-law detrimental-reliance requirement. We note that the Alabama law the Eleventh Circuit Court of Appeals was purporting to apply inBraswell was the law of fraud under the greatly relaxed justifiable-reliance standard. This Court, cognizant of the mischief precipitated by the relaxation of the reasonable-reliance standard, expressly rejected that experiment in fraud liability. Foremost Ins. Co. v. Parham, 693 So.2d 409
(Ala. 1997). Adoption of the no-reliance fraud standard proposed by the State would mark the resurrection of that standard.
We also note that the present case is markedly dissimilar fromBraswell. In Braswell, ConAgra had underweighed truckloads of chickens on its scales and then paid the producers based on those weights. Unlike the defendant in Braswell, Hunt was not in complete control of the payment process. The State retained and ultimately exercised its right at any time to audit Hunt and its payments under the lease agreement. Hunt regularly filed with the Alabama Department of Revenue records reflecting the price at which it sold the gas at the tailgate; therefore, Hunt had available the information from which the State could have calculated what it believed it was due under the lease agreement.