Bosarge Offshore, LLC ("Offshore"), and Kenny G. Bosarge ("Bosarge") (hereinafter referred to jointly as "the plaintiffs") appeal from a judgment as a matter of law entered in favor of Compass Bank. We affirm.
 Facts and Procedural History
Kenny Bosarge has been a shipbuilder for nearly 30 years. One of the vessels he commonly builds is an "offshore oil field service vessel," which is used to deliver supplies and personnel to offshore oil-drilling facilities in the Gulf of Mexico. Once such a vessel is completed, it is sold to an "operator," a company that will use it to deliver supplies and personnel. Bosarge's brother, Rusty, owns a shipyard known as Boconeo Shipbuilding, Inc. ("Boconco"), and at various times Boconco has employed Bosarge.
In late 2002, Bosarge decided to capitalize upon numerous providential events and become an "operator" himself. The rise of oil and gas prices had generated an increase in exploration and production in the Gulf of Mexico; thus, the demand for field-service vessels had correspondingly increased. In addition, the United States Coast Guard had changed certain of its vessel-design requirements, rendering obsolete many of the vessels then in service and opening a market for operators owning ships built in compliance with the new design requirements. These conditions were present when the most fortuitous event of all occurred: Boconco had on hand approximately $281,000 worth of undedicated shipbuilding inventory. When Bosarge approached Rusty about Boconco's using that inventory to build a vessel, Rusty agreed to direct that inventory toward the construction of a vessel for Bosarge without requiring Bosarge to first purchase the inventory.
Bosarge reasoned, based upon years of experience in the shipbuilding industry, that if he could secure financing for the initial phase of constructing a vessel, he could then secure a contract with an oil-drilling company to include his vessel in its fleet. Securing such a contract would position him to obtain the permanent financing necessary to complete the construction of the vessel. Given the value of Boconco's inventory, Bosarge believed that he would need only an additional $200,000 for the initial construction phase, although he ultimately would need approximately $2 million in permanent financing for the remainder of construction.
Bosarge sought to obtain the necessary $200,000 from Compass. In early January 2003, he visited the Compass branch bank located on Bel Air Boulevard in Mobile. Bosarge was referred to a personal banking officer named Chris Garmon. Bosarge explained that he was interested in an unsecured loan in the amount of $200,000. Garmon began completing the necessary paperwork, using information provided by Bosarge. Bosarge later returned to Compass, at an unspecified date, to meet with Garmon. At this second meeting, Bosarge provided further information not earlier *Page 784 
conveyed to Garmon. After each meeting, Garmon sent the information given by Bosarge to Compass's business-loan center located in Birmingham.
Between his first and second visits to Compass, Bosarge incorporated Offshore. Specifically, Bosarge testified that he organized Offshore on the very day that he, on behalf of Offshore, entered into a "Vessel Construction Contract" with Boconco memorializing Boconco's willingness to build a vessel for Offshore. The articles of incorporation of Offshore state that its purpose was "to engage in the operation of oil supply vessels." The date of that contract, and thus the date that Offshore was incorporated, was January 21, 2003.
On February 21, after the second meeting with Bosarge, Garmon received an e-mail from Lisa Vandillon, an underwriter in Compass's business-loan center, informing him that Bosarge's loan had been approved. That day, Garmon telephoned Bosarge and told him that his loan had been approved. Although the plaintiffs maintained at trial that Bosarge had relied upon Garmon's telephone call in later signing the vessel-construction contract, and even reasserted this argument on appeal (Plaintiffs' brief, at 11, and 30-31), in their reply brief, they concede that Offshore — which Bosarge testified was formed on the same date the vessel-construction contract was signed — "was created prior to" Garmon's telephone call. (Plaintiffs' reply brief, at 5; emphasis added.) Thus, there is no support in the record to indicate that Bosarge relied upon Garmon's telephone call in signing the vessel-construction contract.
On February 21, the same day he received Garmon's telephone call, Bosarge returned to Compass and requested that Garmon provide him with some form of written assurance that the Offshore loan had been approved. In Bosarge's presence, Garmon typed and presented to Bosarge a document, on Compass's letterhead, stating:
 "Kenny Bosarge D/B/A Bosarge Offshore LLC
 Reference # : -------
 "To Whom It May Concern:
 "This letter of credit in the amount of $200,000.00 (Two Hundred Thousand Dollars and no/100) is available to the above stated customer. Funds are available at customer's request in any increment needed. If any other information is needed, please feel free to contact our office.
 "Thanks,
 "/s/Chris Garmon
 "Chris Garmon, Personal Business Banking Officer"[1]
After receiving the letter from Garmon, Bosarge spoke with four "operators" to determine whether he could place his vessel with those operators' fleets "under a contract under which [the operators] could make money and so could [Bosarge]." Bosarge also began seeking lenders for permanent financing. Citicorp was solicited for permanent financing, but in February 2003 it indicated that "based upon everything that [it] knew, [it was not] interested in getting involved." Bosarge also had spoken "off and on about this plan of [his] for several years" with a representative of Caterpillar Financial Services Corp., but *Page 785 
he conceded that he never applied for permanent financing with that corporation.
Bosarge also contacted Jeffrey Whitcomb, who has been described by various parties as either an employee of Captive Capital Corporation or as an employee of Stewart Stevenson Equipment Finance.[2] Although it appears that Bosarge might have e-mailed an application for permanent financing to Whitcomb, the record does not indicate when Bosarge sent that application, nor does the record support the notion that Bosarge ever sent to either Captive Capital or Stewart Stevenson any documentation regarding his business proposal or that lie engaged in any action beyond speaking' with Whitcomb. On March 11, Bosarge received an e-mail from Whitcomb stating that based on Bosarge's statements to him, "we have a strong case for approval," but reminding Bosarge that Whitcomb's employer had yet to receive anything from Offshore regarding its proposal for permanent financing.
On March 7, 2003, Compass's small-business loan center, through an underwriter, rescinded its approval of the Offshore loan. Compass did not inform Bosarge of this change until Bosarge visited Compass on March 12 and requested an initial advance of $23,000 on the loan. Because Compass had rescinded its approval, Garmon declined to provide the requested advance, informing Bosarge only that "I can't do it."
Subsequent to this encounter, Bosarge telephoned Whitcomb and informed him that Compass had withdrawn approval for the loan and that Bosarge would no longer be pursuing permanent financing. On March 13, Offshore's attorney mailed Compass a demand letter requesting the initial advance. On March 20, counsel for Compass responded by explaining that, although Compass had withdrawn approval for the loan, Compass remained willing to approve the Offshore loan under certain specified conditions. Offshore did not seek to comply with those conditions.
Approximately two weeks after Compass, through Garmon, refused to advance $23,000 to Offshore, Boconco succumbed to economic pressure and began selling the inventory it had held for construction of a vessel for Offshore. It sold 85% of that inventory within six months. There is no evidence in the record indicating that during the two weeks that intervened between Garmon's refusal to advance funds and the sale of the first item of inventory, Offshore sought from any other company either replacement financing for the initial phase of construction or permanent financing.
On April 2, 2003, the plaintiffs filed the instant action in the Mobile Circuit Court. Their complaint alleged wrongful dishonor of a letter of credit, breach of contract, fraud, and wanton, reckless, and malicious failure to honor a. letter of credit. The case was tried over three days, from June 13, 2005, to June 15, 2005, and after the plaintiffs rested their case-in-chief, the trial court heard, and subsequently granted, Compass's motion for a judgment as a matter of law ("JML") on all four counts. On July 14, 2005, the plaintiffs filed a motion seeking to alter, amend, or vacate the judgment or, alternatively, for a new trial. That motion was denied on July 22, 2005. The plaintiffs appeal only as to their fraud claim.
 Standard of Review
In reviewing a JML, this Court applies the same standard as the trial court applied. Zanaty Realty, Inc. v.Williams, 935 So.2d 1163, 1166 (Ala. 2005). Specifically, viewing the facts in the light most favorable to the nonmovant, we seek to determine whether there was "sufficient *Page 786 
evidence to produce a conflict warranting jury consideration."Nationwide Mut. Fire Ins. Co. v. Pabon, 903 So.2d 759,766 (Ala. 2004).
 Analysis
Ala. Code 1975, § 6-5-101, provides: "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, . . . constitute legal fraud." In addition, the plaintiff must rely to his detriment upon those misrepresentations. See Pugh v. KaiserAluminum Chem. Sales, Inc., 369 So.2d 796, 797
(Ala. 1979) ("The plaintiff must rely on that false representation and must be damaged as a proximate result."); see also Crowne Invs., Inc. v. Bryant, 638 So.2d 873,876-77 (Ala. 1994) (stating that a fraud action is viable only if the plaintiffs damage is a proximate result of his reasonable reliance upon the defendant's misrepresentation).
In the instant appeal, the plaintiffs have argued that they detrimentally relied upon Compass's misrepresentation in three ways. None of those three alleged acts of detrimental reliance, however, brings the plaintiffs' action within the definition of an actionable fraud.
Before analyzing these claims, we note that in their brief the plaintiffs argue that Compass committed fraud both by Garmon's oral representation that Compass had approved the Offshore loan as well as by Garmon's issuance of the "letter of credit." Before the trial court, in responding to Compass's motion for a JML, however, the plaintiffs' repeatedly argued that the fraudulent conduct involved only the letter. With the exception of the plaintiffs' first claim on appeal, hereinafter described, they have not contended that Garmon's oral representation constituted fraud. Because we find the first ground to have been abandoned, see discussion infra, we consider the plaintiffs to have abandoned any contention that Compass should be held liable for Garmon's alleged oral misrepresentation to Bosarge.
 I. Whether Garmon's Alleged Misrepresentation Induced the Plaintiff's to Contract with Boconco
The plaintiffs' first argument on appeal is that both Garmon's oral representation and the "letter of credit" written by Garmon induced Bosarge to enter into the vessel-construction contract with Boconco. (Plaintiffs' brief, at 11, 30-31.) However, as noted above, the plaintiffs later abandoned this argument in their reply brief when they conceded that the vessel-construction contract was signed before Garmon made the alleged oral misrepresentation and provided Bosarge with the letter. Therefore, there is no evidence indicating that the plaintiffs detrimentally relied on Garmon's alleged misrepresentation in Offshore's entering into the vessel-construction contract.
 II. Whether the Garmon Letter Induced Bosarge to Transition from Shipbuilder to Operator
The plaintiffs next argue that they detrimentally relied upon the Garmon letter because, they argue, in reliance on that letter Bosarge made the transition from a shipbuilder to an operator. In the hearing on the motion for a JML, the plaintiffs argued that Bosarge "showed [the letter] to other people," such as past customers, thus "burning bridges" and irretrievably damaging business relationships that had been lucrative during Bosarge's career as a shipbuilder. As the plaintiffs characterize the situation on appeal, "for the first time, [Bosarge] announced to the market-place that he was stepping into competition with the companies which formerly comprised his customer base." The only specific evidence indicating that Bosarge "announced to the marketplace" his intent to compete with others through Offshore, however, is Bosarge's testimony that he *Page 787 
contacted four named operators in an effort to find an operator willing to put Offshore's vessel in its fleet.
In making their argument during the hearing on the motion for a JML, the plaintiffs advanced a novel legal theory. As counsel for the plaintiffs explained to the trial court:
 "I don't think [reliance] has to be necessarily linked with the damage. Whether [Bosarge] was damaged by the fraud is a different question than whether he relied on it to his. detriment. If we prove detrimental reliance, . . . we've proven fraud. The damage question is what damage has flowed?"
Granted, the element of "reliance" per se is disconnected from damage, a separate element. The lumping of the concept of "reliance" with "damage" or "detriment" — whence comes "detrimental reliance" — is simply another way of referring to the combined elements of reliance and damage. The notion that detrimental reliance is untethered to damage, however, is completely unfounded. As we have recently noted, "a fraud claim fully accrues once any legally cognizable damage has proximately resulted, i.e., once the plaintiff has `detrimentally' relied on the fraud." Ex parte HaynesDownard Andra Jones, LLP, 924 So.2d 687, 694
(Ala. 2005). Or as Justice Houston recently explained: "Fraud, as a cause of action, requires some damage stemming from
reliance on a misrepresentation or suppression intended to induce that reliance. . . ." Hunt Petroleum Corp. v.State, 901 So.2d 1, 12 (Ala. 2004) (Houston, J., concurring specially) (emphasis added). Thus it is critical that a plaintiff prove that his reliance on the fraud proximately caused the damage that forms the basis of his action.
The plaintiffs' argument as to how they relied to their detriment lacks merit for three reasons. First, Bosarge's testimony, put in context, describes his decision to incorporate Offshore in January 2003 and further describes his decision, which was made "about that time[,] to put into play this plan to be an operator" (emphasis added); his plan entailed informing his former customers of his intent to compete with them as an operator. Such evidence indicates that he did not wait for the February 21 notification by Garmon that temporary financing had been approved but rather began informing his former customers before that event.
Second, Bosarge offered no evidence indicating that his intended "transition" actually harmed him. His only "evidence" indicating harm was his personal conjecture that his former customers would not use his business should he return to the shipbuilding trade. This speculation does not rise to the level of substantial evidence indicating detrimental reliance. SeeNelson v. University of Alabama Sys., 594 So.2d 632,635 (Ala. 1992).
Finally, and perhaps most importantly, Bosarge was asked whether Compass's alleged misrepresentation had "damaged [his] reputation or [his] ability to ply [his] trade in the boat building business." Counsel for Compass objected, and after a short colloquy, the trial court stated:
 "Well, I'm going to not allow the testimony from [Bosarge] about any impact that's been had on him personally. . . . If I allow you to, I'll allow you to call him back up and pursue it."
The plaintiffs never subsequently sought permission to, or attempted to, pursue this line of questioning and no evidence was presented with respect to whether or how Bosarge individually was hindered by a diminished reputation or lost business.[3] The plaintiffs have not attacked the court's *Page 788 
order excluding such evidence; thus, they have acquiesced in that decision by the court. With no concrete evidence indicating that Bosarge's transition from shipbuilder to vessel operator harmed him, this basis for attacking the trial court's order is meritless.
 III. Whether the Gannon Letter Induced the Plaintiffs Not to Seek Replacement Financing
The plaintiffs' final argument is that they presented evidence indicating that Garmon's written misrepresentation induced Bosarge not to seek initial-phase lending from another lender. In the hearing before the trial court on Compass's motion for a JML, however, the only mention of Bosarge's contact or lack of contact with other lenders was in the form of this argument:
 "[The plaintiffs] made steps to line up [permanent financing] which put them in the position of being an operator and made it difficult, and that difficulty has lasted to this day, to operate in the shipbuilding business."
During that hearing, the trial court repeatedly sought clarification as to the elements of the plaintiffs' fraud claims, asking the plaintiffs eight separate times to identify exactly how they had detrimentally relied upon Compass's alleged misrepresentation. The plaintiffs never identified Bosarge's decision to refrain from seeking other financing as an aspect or manifestation of that detrimental reliance. The plaintiffs have thus failed to preserve that argument for appellate review. "`"`This Court cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal.'"'" Shewmake v. Estate of Shewmake,940 So.2d 260, 267 (Ala. 2006) (quoting Halford v. AlamoRent-A-Car, LLC, 921 So.2d 409, 416 (Ala. 2005), quoting in turn other cases).
Even had the plaintiffs raised such an argument, it would lack sufficient merit to warrant the denial of Compass's motion for a JML. At trial, Bosarge testified that had he learned earlier that Compass intended not to loan him $200,000, he would have had the opportunity to look elsewhere for the $200,000 while the opportunity existed to build the vessel with that amount in initial inventory. Yet by the time Bosarge learned of the alleged misrepresentation, the plaintiffs allege, "the opportunity to build the vessel under the financing structure proposed was lost." (Plaintiffs' brief, at 33-34.) This argument is based upon pure conjecture. The record indicates that some two weeks elapsed during which Bosarge knew that Compass had rescinded its approval of the Offshore loan and during which Boconco continued to hold the inventory for Offshore. During that time, neither Bosarge nor Offshore sought any alternative sources of financing. Therefore, there is again no specific evidence indicating that the plaintiffs were actually harmed by Compass's alleged misrepresentation. Rather, the evidence clearly indicates that Bosarge never sought $200,000 in initial-phase financing from another lender during the period in which the "opportunity" to construct the vessel existed. Thus, again there is no substantial evidence indicating any detrimental reliance.
Finally, we note that obtaining the $200,000 in initial financing was beneficial to Offshore only if that entity could also "nail down" an additional $2 million in permanent financing. The facts indicate *Page 789 
that as of the date Bosarge learned that Compass had rescinded its approval of the $200,000 loan, no entity had offered to provide the permanent financing critical to the success of Bosarge's venture. Thus any suggestion that the plaintiffs were harmed by Compass's rescinding its approval is necessarily based upon further speculation that some entity would have actually provided the necessary permanent financing.
In short, the plaintiffs have failed to present substantial evidence indicating that they detrimentally relied upon any allegedly fraudulent misrepresentation by Compass. Because we find no detrimental reliance, we pretermit any consideration of whether Compass's statements actually constituted a misrepresentation or whether other elements of a fraud claim were satisfied.
 Conclusion
The judgment of the trial court is affirmed.
AFFIRMED.
SEE, WOODALL, STUART, and BOLIN, JJ., concur.
[1] It is undisputed that Garmon contacted Bosarge and typed the letter of credit on February 21. He committed at least one error in that letter of credit, misidentifying Offshore as Boconco Offshore. Although he handed Bosarge the version containing the error, he corrected this error in Bosarge's presence, gave him a copy of the corrected version as well, and later faxed that corrected version to Bosarge on February 27.
[2] Stewart Stevenson is actually a guarantor, as opposed to a lender.
[3] Offshore, of course, could not possibly be hindered by Bosarge's damaged ability to make a living as a shipbuilder; it was created for the purpose of operating, not building, ships. Thus the plaintiffs' "transition" argument goes only to Compass's potential liability to Bosarge individually.