SHAW, Justice.
 

 Eufaula Hospital Corporation, formerly doing business as Lakeview Community Hospital (“Lakeview”); Foley Hospital Corporation, formerly doing business as South Baldwin Regional Medical Center (“South Baldwin”); and CHS Professional Services Corporation (“CHSPSC”), the defendants below, appeal from the trial court’s order certifying as a class action the breach-of-contract claims asserted by Arleana Lawrence and Lisa Nichols. We vacate the trial court’s class-action-certification order and remand the case.
 

 Facts and Procedural History
 

 In March 2003, Lawrence twice visited Lakeview seeking medical treatment for migraine headaches. Lawrence did not have medical insurance and was not participating in Medicare or Medicaid. On both •visits, Lawrence executed a contract for treatment (an “admission contract”). Regarding the charge for the medical treatment she was to receive, the admission contract stated, in pertinent part:
 

 “The undersigned individually obligates himself/herself to pay the account of the Facility in accordance with the regular rates and terms of the Facility.”
 

 Lawrence was ultimately billed $3,361.50 for the medical treatment she received.
 

 Nichols sought medical treatment at South Baldwin three times in 2005 for surgery on her arm and for treatment of injuries sustained in an automobile accident. She also executed an admission contract on each visit; regarding payment, these admission contracts contained language identical to the language in Lawrence’s admission contracts. Nichols was ultimately billed $20,659.90 for the medical treatment she received.
 

 Lawrence subsequently filed a class-action complaint against Lakeview and its parent corporation, Community Health Systems, Inc. (“CHS”), seeking (1) damages for breach of contract or, alternatively, unjust enrichment; (2) a judgment declaring that a contractual relationship with an open-price term existed and declaring a reasonable price for the medical services rendered; and (3) injunctive relief.
 
 [1]
 
 The
 
 *32
 
 complaint was amended numerous times, and in the last amended complaint, titled “Fourth Amended Class Action Complaint” (“the complaint”), Nichols was joined as a plaintiff and South Baldwin, which was also owned by CHS, was joined as a defendant. Additionally, CHSPSC — a subsidiary of CHS that provided administrative services to Lakeview and South Baldwin — was added as a defendant. Hereinafter, Lakeview, South Baldwin, and CHSPSC will be referred to collectively as “the defendants.”
 

 The plaintiffs contended in the complaint that the rates the defendants charged the plaintiffs for treatment was not stated in the admission contracts the plaintiffs executed. Thus, the plaintiffs contend, a price is implied by law and must reflect the reasonable value of the medical services. See
 
 Shellnutt v. Randolph County Hosp.,
 
 469 So.2d 632, 633 (Ala.Civ.App.1985) (“Where ... there is no evidence of an express contract, an agreement is implied that a hospital will render services and in return receive a reasonable fee for these services.”), and
 
 Cardon v. Hampton,
 
 21 Ala.App. 438, 439, 109 So. 176, 177 (1926) (“[I]n the absence of an express agreement as to the details of the time and place of payment, and in the absence of a demand by the physician for payment in advance, the implied agreement was that [the] defendant would pay the physician the reasonable value of the service rendered.”). The plaintiffs argue that the defendants charged insured patients and patients who received governmental benefits much lower rates than the rates they charged uninsured or self-pay patients like the plaintiffs. They thus maintain that the rates charged uninsured patients and self-pay patients were inflated and unreasonable and, therefore, that the defendants breached the provision implied in the admission contract that patients would pay a “reasonable” charge. The plaintiffs further sought injunctive relief directing the defendants to cease charging and collecting “unreasonable rates to uninsured hospital patients” as well as a declaration “of the amount of a reasonable price” for the services rendered.
 

 The plaintiffs filed a motion to certify a class action under Rule 23(b)(2) and Rule 23(b)(3), Ala. R. Civ. P., and the defendants moved for a summary judgment. The trial court held a hearing on these motions. On October 29, 2007, the trial court issued an order granting a class-action certification under Rule 23(b)(2) and Rule 23(b)(3), for two subclasses:
 

 “Subclass 1: Subclass 1 is represented by Arleana Lawrence, and is defined as follows:
 

 “All persons between September 30, 1998, and the present who initially presented at the Emergency Room at Lake-view Community Hospital, and who were treated at the hospital, classified as self-pay or uninsured patients, and were charged the hospital’s chargemaster[
 
 2
 
 ] rates for services received. This class does not include any person who has filed for bankruptcy, and included the subject hospital bills within the bankruptcy, or against whom a valid judgment for the subject hospital bills has been taken.
 

 “Subclass 2: Subclass 2 is represented by Lisa Nichols, and is defined as follows:
 

 “All persons between November 17, 1999 and the present who initially presented at the Emergency Room at South Baldwin Regional Medical Center, and
 
 *33
 
 who were treated at the hospital, classified as self-pay or uninsured patients, and were charged the hospital’s charge-master rates for services provided. This class does not include any person who has filed for bankruptcy, or against whom a valid judgment for the subject hospital bills has been taken.”
 

 The trial court also issued an order denying the defendants’ summary-judgment motion. Pursuant to Ala.Code 1975, § 6-5-642, the defendants appeal from the trial court’s order certifying the class action. See Ala.Code 1975, § 6-5-642 (“A court’s order certifying a class or refusing to certify a class action shall be appealable in the same manner as a final order to the appellate court which would otherwise have jurisdiction over the appeal from a final order in the action.”).
 

 The Defendants’ Merits Argument
 

 First, the defendants argue on appeal that the entire premise of the plaintiffs’ action — that the admission contract contains an undefined term as to price — is incorrect. Specifically, the defendants contend that the language in the admission contract stating that the plaintiffs will be charged “in accordance with the regular rates and terms of the Facility” specifically defines that the price that will be charged is in accordance with the particular hospital’s “chargemaster,” a list that specifies charges for all procedures and treatments the hospital might administer. The defendants contend that it is impossible to know at the time an admission contract is executed what medical services might ultimately be required, but that, nevertheless, the actual charge for all medical treatments is defined in the chargemaster. See
 
 Murray v. Alfab, Inc.,
 
 601 So.2d 878, 886 (Ala.1992) (“ ‘It is not, therefore, necessary that the price should be fixed by the contract itself ... provided that the parties have settled upon some method by which the price may be determined with certainty.’” (quoting 1 F. Mechem,
 
 The Law of Sale of Personal Property
 
 § 210 (1901))). In support of their argument, the defendants cite several cases from other jurisdictions interpreting hospital admission contracts as containing defined price terms. See
 
 DiCarlo v. St. Mary Hosp.,
 
 530 F.3d 255, 264 (3d Cir.2008) (holding that the phrase in an admission contract requiring the patient to pay “all charges” was a price term that “was not in fact open” because “ ‘all charges’ unambiguously can only refer to [the hospital’s] uniform charges set forth in its Chargemaster”);
 
 Cox v. Athens Reg’l Med. Ctr., Inc.,
 
 279 Ga.App. 586, 589, 631 S.E.2d 792, 796 (2006) (rejecting the argument that an admission contract that provided that patients pay a hospital for medical services “in accordance with the rates and terms of the hospital” created “an open price term for which a ‘reasonable’ price must be substituted by the court”);
 
 Shelton v. Duke Univ. Health Sys., Inc.,
 
 179 N.C.App. 120, 125, 633 S.E.2d 113, 116 (2006) (holding that an admission contract calling for a patient to pay “the regular rates and terms of the Hospital at the time of patient’s discharge” referred to the rates of service contained in the hospital’s chargemaster and thus was definite and certain or capable of being made so); and
 
 Woodruff v. Fort Sanders Sevier Med. Ctr.,
 
 (No. E2007-00727-COA-R3-CV, Jan. 16, 2008) (Tenn.Ct.App.2008) (not reported in S.W.3d) (holding that an admission contract specifying that a patient will pay a hospital’s “rates and terms” was not an indefinite term). But see
 
 Doe v. HCA Health Servs. of Tennessee, Inc.,
 
 46 S.W.3d 191 (Tenn.2001) (holding that an admission contract specifying that the patient agrees to pay a hospital for all “charges” was not sufficiently definite). Because, the defendants maintain, the
 
 *34
 
 charges for medical services are in fact readily identifiable, the trial court erred in resorting to a determination of an implied reasonable charge without first addressing whether the admission contract contained an open term.
 

 In opposition to this argument, the plaintiffs cite several Alabama decisions holding that a determination on the ultimate merits of an action during class certification is improper. See
 
 Mayflower Nat’l Life Ins. Co. v. Thomas,
 
 894 So.2d 637, 641 (Ala.2004) (“On a motion for class certification, the sole issue before the trial court is whether the requirements of Rule 23 have been met .... ”);
 
 Mitchell v. H & R Block, Inc.,
 
 783 So.2d 812, 816 (Ala.2000) (holding that a trial court “should not make” a determination of the “merits of a plaintiffs case in a class-certification hearing”); and
 
 Ex parte Government Employees Ins. Co.,
 
 729 So.2d 299, 303 (Ala.1999).
 

 The defendants do not argue that the cases cited by the plaintiffs should be overruled and do not offer a procedure for this Court to use in reviewing a challenge to the merits in an appeal from a class-action certification.
 
 [3]
 
 Further, the defendants did not seek to certify these issues for an interlocutory appeal under Rule 5, Ala. R.App. P;
 
 [4]
 
 Therefore, we decline to review the merits of the plaintiffs’ claims.
 

 Class Certification
 

 “This Court has stated that ‘class actions may not be approved lightly and ... the determination of whether the prerequisites of Rule 23 have been satisfied requires a “rigorous analysis.” ’ ”
 
 Mayflower Nat’l Life Ins. Co. v. Thomas,
 
 894 So.2d at 641 (quoting
 
 Ex parte Citicorp Acceptance Co.,
 
 715 So.2d 199, 203 (Ala.1997)). “In reviewing a class-certification order, this Court looks to see whether the trial court exceeded its discretion in entering the order; however, we review de novo the question whether the trial court applied the correct legal standard in reaching its decision.”
 
 University Fed. Credit Union v. Grayson,
 
 878 So.2d 280, 286 (Ala.2003). Furthermore,
 

 “[w]e note that an abuse of discretion in certifying a class action may be predicated upon a showing by the party seeking to have the class-certification order set aside that ‘the party seeking class action certification failed to carry the burden of producing sufficient evidence to satisfy the requirements of Rule 23.’
 
 Ex parte Green Tree Fin. Corp.,
 
 684 So.2d 1302, 1307 (Ala.1996). Thus, we
 
 *35
 
 must consider the sufficiency of the evidence submitted by the plaintiff customers.”
 

 Compass Bank v. Snow,
 
 823 So.2d 667, 672 (Ala.2001). See also
 
 Smart Prof'l Photocopy Corp. v. Childers-Sims,
 
 850 So.2d 1245, 1249 (Ala.2002) (holding that if plaintiffs fail to meet the evidentiary burden as required by Rule 23, Ala. R. Civ. P., then the trial court exceeds its discretion in certifying a class action). If the plaintiffs here have failed to meet the evidentiary burden as required by Rule 23, then the trial court exceeded its discretion in certifying a class action.
 

 In order to obtain class certification, the plaintiffs must establish all the criteria set forth in Rule 23(a), Ala. R. Civ. P., and at least one of the criteria set forth in Rule 23(b).
 
 Grayson,
 
 878 So.2d at 286. Rule 23(a) provides:
 

 “(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative pai’ties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.”
 

 Rule 23(b) provides, in pertinent part:
 

 “(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 

 “(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 

 “(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.”
 

 In the instant case, the trial court certified a class action under both Rule 23(b)(2) and Rule 23(b)(3). On appeal, the defendants offer numerous challenges to the trial court’s class certification.
 

 First, the nature of the plaintiffs’ claims must be made clear: the class members certified by the trial court in both subclasses are persons who were “self-pay or uninsured patients” who were initially treated in the emergency rooms of Lake-view and South Baldwin and who were later “charged the hospital’s chargemaster rates” for the medical care they received. The plaintiffs contend that a contract with an allegedly undefined price was formed between the plaintiffs and the hospitals. Under Alabama law, the plaintiffs assert, the undefined price must be a reasonable price for the services performed. The plaintiffs allege that the ultimate price charged by the defendants — -the charge-master rate — was an unreasonable price. Thus, the plaintiffs allege, the defendants have breached the contract and its implied-price term.
 

 
 *36
 
 We address only one of the numerous challenges by the defendants: whether determining a reasonable charge for each class member requires individualized determinations making class action inappropriate in this case.
 

 In
 
 Cardon v. Hampton,
 
 supra, the Court of Appeals held that an implied agreement for the provision of medical services required the payment of “the reasonable value of the service rendered, within a reasonable time after its rendition,” and the determination of the reasonable fee “depend[ed] on circumstances, custom, and the like.” 21 Ala.App. at 439, 109 So. at 177. Further, a reasonable market value has been described “as the price that a willing seller would sell, and a willing buyer would buy, neither being compelled to sell or buy.”
 
 Crump v. Geer Bros., Inc.,
 
 336 So.2d 1091, 1096-97 (Ala.1976). In
 
 Roberts v. University of Alabama Hospital,
 
 27 So.3d 512 (Ala.Civ.App.2008), the court held that the trial court’s reference to a hospital’s chargemaster in determining a reasonable price “was consistent with Alabama precedents indicating that evidence from hospital personnel concerning the reasonableness of treatment rendered and charges billed to patients is competent to demonstrate ‘reasonable charges’....” 27 So.3d at 517. See also generally
 
 Johnson v. Health Care Auth. of Huntsville,
 
 660 So.2d 1017, 1018-19 (Ala.Civ.App.1995) (affirming a summary judgment for a hospital operator on a claim that charges included in a hospital lien were reasonable based upon unrebutted affidavits of nurse manager and budget coordinator for hospital concerning reasonableness of charges); and
 
 Ex parte Univ. of South Alabama,
 
 737 So.2d 1049, 1053 (Ala.1999) (unrebutted testimony of the acting director of business services for hospital that the hospital’s charges for services rendered to an injured party were reasonable was prima facie evidence that supported hospital’s entitlement to judgment as a matter of law on a quantum meruit claim).
 

 Other jurisdictions have noted that numerous considerations are implicated in determining a reasonable charge for medical services. In
 
 Doe v. HCA Health Services of Tennessee, Inc.,
 
 supra, the Court stated:
 

 “Neither the parties nor our own research have disclosed a Tennessee appellate case considering the issue of ‘reasonable value’ of medical goods and services provided by a hospital to a patient. However, appellate decisions from other states suggest that ‘reasonable value’ in such cases is to be determined by considering the hospital’s internal factors as well as the similar charges of other hospitals in the community. See
 
 Galloway v. Methodist Hosp., Inc.,
 
 658 N.E.2d 611, 614 (Ind.Ct.App.1995) (noting the testimony of hospital’s controller that ‘Hospital’s charges were comparable to other facilities in northwest Indiana ... [and that] Hospital’s charges were based on Hospital’s budgetary needs[,]’ the court found that ‘[t]he fact that Hospital’s charges are based on the costs associated with providing health care does not make the charges unreasonable’);
 
 Heartland Health Sys., Inc. v. Chamberlin,
 
 871 S.W.2d 8, 11 (Mo.Ct.App.1993) (finding that the testimony of the hospital representative that ‘she was familiar with the customary charges in the medical industry for services of the same type as those rendered to [the patient]’ was sufficient to make prima facie case for the reasonable value of the services rendered);
 
 Victory Mem’l Hosp. v. Rice,
 
 143 Ill.App.3d 621, 97 Ill.Dec. 635, 493 N.E.2d 117, 120 (1986) (stating that ‘any assessment of the reasonableness of a private hospital’s charges must include
 
 *37
 
 consideration and recognition of the particular hospital’s costs, functions and services to make a valid determination of whether such charges were reasonable for that hospital alone or compared to the charges of other area hospitals’);
 
 Ellis Hosp. v. Little,
 
 65 A.D.2d 644, 409 N.Y.S.2d 459, 461 (N.Y.App.Div.1978) (stating that proof of the reasonable value of services included testimony that ‘the cost of the hospital’s operation was the basic consideration in establishing the charges for the services rendered’ and that ‘the charges set forth in decedent’s ledger were ... similar to those at [another hospital in the community]’).
 

 “We find that the foregoing standards are appropriate for use in Tennessee in cases in which there is no valid, enforceable contract between a hospital and its patient. We adopt these standards for determining the ‘reasonable value’ of the medical goods and services provided by the hospital to the patient in such cases.”
 

 46 S.W.3d at 198-99 (footnote omitted). See also
 
 Howard v. Willis-Knighton Med. Ctr.,
 
 924 So.2d 1245, 1263 (La.Ct.App.2006) (holding that a “reasonableness of charges inquiry requires individual considerations that may include ... the patient’s financial status, the actual hospital services rendered, their customary value, and the amount of a recovery from a third party”), and
 
 Victory Mem’l Hosp. v. Rice,
 
 143 Ill.App.3d 621, 625, 493 N.E.2d 117, 120, 97 Ill.Dec. 635, 638 (1986) (“any assessment of the reasonableness of a private hospital’s charges must include consideration and recognition of the particular hospital’s costs, functions and services to make a valid determination of whether such charges were reasonable for that hospital alone or compared to the charges of other area hospitals”).
 

 In proffering a class-wide method of determining reasonable charges for the medical services provided to each member of the class, the plaintiffs in the instant case offered as an expert witness Kenneth Thorpe, Ph.D.,
 
 [5]
 
 a health economist. Dr. Thorpe testified that although a charge-master contains established prices for a service a hospital provides, the actual cost of the service, which is an estimate that “the hospital makes of what ... it actually cost[s] the facility to provide those services to a patient,” is quite different from and generally much lower than the chargemas-ter price. Further, Dr. Thorpe testified that Medicare, Medicaid, and Blue Cross, the three largest groups of third-party payers for hospital patients, actually pay different amounts for medical services provided to their enrollees. Ml three — along with self-pay or uninsured patients — are
 
 charged
 
 the chargemaster rate, but they actually
 
 pay
 
 lesser amounts. Medicare rates are dictated by the federal government, and that program pays 100% of the costs of treating its enrollees. The State of Mabama sets Medicaid payment rates and pays 96% to 98% of the costs of treatment. Blue Cross actually negotiates its payment rate with the “hospital industry” and pays either 80% of the charges or 111% of “their calculation of the cost of treating the patient, whatever is less.”
 
 [6]
 

 In formulating an across-the-board reasonable charge for the medical services provided to all class members, Dr. Thorpe used as a “benchmark” the rates paid by Medicare, Medicaid, and Blue Cross, which
 
 *38
 
 he described as what those entities considered as reasonable rates, and, adding “a little bit of a premium,” devised what he opined was a reasonable charge for the services provided to the class members in this case: 115% of the actual costs of the medical service. He testified:
 

 “I only had three benchmarks I can look at for reasonable prices, what the federal government says is a reasonable price, what the State of Alabama says is a reasonable price for Medicaid, and what is negotiated in the private insurance market. And on average, in the private insurance market, hospitals are paid about 111 percent of cost. My sense was that was a reasonable starting point for two reasons. One is that it covered the cost of treating patients. And two, it was a negotiated rate in the private insurance market. And on average, in the private insurance market, hospitals are paid about 111 percent of cost.
 

 “My sense is that it would be fair to add a little bit of premium onto that 111 percent figure. That’s how I came up with the 115 percent. The ease of having a uniform application, it covers the treatment cost of providing services; and in fact, it adds the 15 percent profit margin if the patients paid fully what those bills were.”
 

 Testimony at the class-certification hearing indicated that the defendants’ computerized billing system listed the cost of each medical service provided each patient. These costs were transmitted to Medicare, Medicaid, and Blue Cross and were used as a basis by those entities to determine their respective payments. The plaintiffs contended that Dr. Thorpe’s computation of a reasonable charge, cost plus 15%, or 115% of the cost, could easily be electronically calculated from the defendants’ billing records.
 

 On appeal, the defendants argue that Dr. Thorpe’s formula for calculating a reasonable charge is flawed. Specifically, the defendants’ expert, James Abernathy, testified that the rates paid by Medicare, Medicaid, and Blue Cross are inappropriate bases for determining reasonable charges. First, Abernathy testified that these third-party payors did not in reality pay all the actual costs incurred by hospitals:
 

 “[0]ne, costs really aren’t costs. The hospitals [have] more cost[s] than what Medicare recognizes.
 

 “Two, you are not really getting the margin. And I think he was — I’m not sure if he is using the Medicare Cost Report or he’s using the Blue Cross Cost Report in his formula.
 

 “He is using the Medicare cost-to-charge number in his report, and that’s what he testified to here, but he also said he wanted to use Blue Cross.
 

 “Blue Cross uses comparable Medicare cost reporting. I believe they actually disallowed more cost than Medicare. So when you look at the Blue Cross cost-to-charge ratio, you have similar problems at the same magnitude so the problem is multiple fold.
 

 “Costs aren’t being covered by Medicare, they’re not being covered by Medicaid, and they are probably not being covered by Blue Cross.
 

 “Once you take the Blue Cross cost, add the 11 percent to it, I’m not sure if it’s a break-even or not. I’ve not done that analysis specific to this hospital. But we know Medicare isn’t, and we know that Medicaid isn’t. Blue Cross is marginal at best. And we know that there is a very large percentage of the self-pay that don’t pay anything.
 

 “I believe, Dr. Thorpe’s testimony was 13 percent of costs were paid by the uninsured. So now we have the unin
 
 *39
 
 sured only paying IB percent of their cost. We have Medicare paying 90 percent of their allowable cost, which we know is 9 million less than their total cost, and we have Blue Cross paying something less than their 11 percent over true cost.
 

 “So the hospital, you know, is in a losing proposition when you look at the total of Medicare, Medicaid and self-pay. When you add all of that together, that’s about 90 percent — and Blue Cross— about 90 percent of the revenue flow isn’t covering cost. And as a result, and I think I recently found out that the community is now even having to support Lakeview Hospital because they are not paying cost.
 

 “And under Dr. Thorpe’s theory, cost plus 11 percent would be great if everybody paid, but everybody doesn’t pay cost and not everybody pays.”
 

 Dr. Thorpe admitted in his testimony during the class-certification hearing that Medicare, for payment purposes, does not recognize certain “elements of costs” incurred by hospitals. Thus, the “eosts” recognized by Medicare for purposes of calculating its payments do not include all the costs incurred by hospitals. Dr. Thorpe testified that he did not know the exact percentage of costs excluded by Medicare, that the percentage varied year to year and hospital to hospital, and that he did not know how Blue Cross calculated its cost-to-charge ratios. He did testify, however, that the costs excluded by Medicare were “small in number.” However, his testimony in this regard was not unequivocal:
 

 “[Defendants’ counsel:] So if you’re basing your cost element of your theory on the Medicare cost report, that doesn’t include all the cost of the hospital. And you want to have the self-pay patients pay 15 percent above that cost. You really can’t tell the Court if they would be paying 15 percent above the true cost or if they’re just paying 15 percent above the Medicare allowable cost. Is that correct?
 

 “[Dr. Thorpe:] About the true treatment cost? I feel pretty confident about this. I mean, the types of things that are excluded from the underlying costs in Medicare’s cost report are not things like ancillary services, labs, and so on. They’re things like Medicare related bad debt that’s not included.”
 

 Abernathy also testified that, even assuming one could use the Blue Cross or Medicare costs calculations as a foundation to determine a reasonable charge for medical services provided to the class members, the cost-to-charge ratio varies greatly between services:
 

 “[P]atients receive different services. And different services have different markups. For instance, a pacemaker is a very expensive item. The markup on pacemaker would be much smaller than the markup on an aspirin.
 

 “So if you have a patient that comes in — And I think actually one of the named plaintiffs had a migraine. So if they come in and they are treated with drugs for a headache, they are going to have one type of a markup based on whatever the markup is on those drugs and the markup is in whatever venue ... they came through, if it was the [emergency room] or some other area, versus someone that has a pacemaker inserted and so forth.
 

 “So if you use just the overall margin or multiplier cost-to-charge ratio that Dr. Thorpe is proposing, you are going to be overly generous to one patient, and you’re going to penalize the other patient because one’s cost-to-charge ratio is going to be much lower than the other.”
 

 
 *40
 
 Abernathy further testified that arrangements between hospitals and Medicare and Blue Cross allow Medicare and Blue Cross to equalize, after the fact, any inequities between individual charges:
 

 “Blue Cross and Medicare both, they are a single payor for their whole book of business. So you’ve got — Blue Cross can equalize those inequities because they are the only one paying. So they have an annual settlement after the fact, and say, okay, did we hit the mark, did we get to where we wanted to be, yes or no. We can settle up at the end of the year. The money is just coming from Blue Cross to the hospital.
 

 “When you get to self-pay, you have all of these individualized issues relative to services rendered and inability to pay and so forth, and you can’t have this aggregate settlement at the end of the year where you bring everybody together and say, okay, I overpaid you; I underpaid you.
 

 “You can’t do that. You can’t go back to them and do that. There is no one person paying. It’s all these individual people paying the hospital.”
 

 Dr. Thorpe admitted that his formula for determining a reasonable charge did not contain a procedure by which hospitals and uninsured or self-pay patients could address, after the fact, these differences in charges.
 

 Finally, Abernathy testified that determining reasonableness of charges would be a fact-intensive individual evaluation of each patient’s charges:
 

 “[Defendants’ counsel:] ... But the opinion you have given in your report and in your deposition as to how reasonableness should be determined, what a reasonable expectation of payment would be, can you describe that? How would you go about doing that? I know you told us you haven’t done that. But how would you do that in th[ese] cases for these various plaintiffs for their different services?
 

 “[Abernathy:] First, I would look at the market to try to identify who’s the competition, who’s situat[ed] similarly in the market as these particular hospitals are and do a charge-by-charge comparison of what are their charges, what are the other hospital’s charges to determine whether or not they are within a reasonable range of those folks that are similarly situated in the market.
 

 “[Defendants’ counsel:] And would you have to do that on a patient-by-patient basis?
 

 “[Abernathy:] You would have to do it on a service-by-service basis, which means that the Chargemaster — Some hospitals have 40,000 items on their Chargemaster. So you would have to do item by item to compare.
 

 ‘You could sample it, but you’d still have to do a fairly detailed analysis individually on each particular item so when you translate that to a patient, if a patient was charged fairly, then you would have to do it patient by patient looking at the individual items that were charged to that patient.”
 

 Additionally, testimony was introduced at the class-certification hearing indicating that many self-pay or uninsured patients are offered discounts on their bills, including prompt-pay discounts and charity discounts, or the debts are settled for a lesser amount. Also, many patients never pay their bills, and some debts are turned over to collection agencies.
 

 Caselaw cited by the defendants confirms the problems identified by Abernathy. As the defendants note, the Court of Civil Appeals has explicitly rejected the use of Medicaid, Medicare, and Blue Cross payment rates in determining reasonable
 
 *41
 
 rates for medical services. In
 
 Roberts,
 
 supra, James Roberts and Virginia Roberts were injured in a motor-vehicle collision and were treated at University of Alabama Hospital (“the hospital”) and released. The hospital subsequently recorded hospital liens pursuant to § 35-11-870 et seq., Ala.Code 1975, which provide for the recording of liens “for all reasonable charges for hospital care, treatment and maintenance of an injured person .... ”
 

 The Robertses later sued two individuals who allegedly had caused their injuries in the motor-vehicle collision. The hospital was joined as a party, and the Robertses sought a determination of the amount of hospital charges secured by the hospital liens; ultimately, the trial court, after deducting a 15% indigent-care recovery charge sought by the hospital, declared that the hospital was entitled to the liens.
 

 On appeal, the Robertses challenged whether the trial court properly applied the portion of § 35-11-370 that provides for a hospital lien for all “reasonable” charges. In determining the amount of the liens to which the hospital was entitled, the trial court received testimony that the prices charged by the hospital were set on a chargemaster and that the chargemaster prices were applied across the board to all patients and were updated annually. However, the Robertses presented testimony indicating that the hospital accepted payments from Medicare, Medicaid, and Blue Cross that were significantly below the chargemaster price. The trial court noted the following testimony by the director of reimbursement for the hospital:
 

 “‘[B]y law, the hospital must accept these sums in full payment for services rendered to those patients qualified to receive such governmental benefits and the fact of acceptance of such an amount in no way reflects upon the cost or the value of the services rendered to such patients. The alternative to the hospital in such cases, in lieu of accepting payment under a government benefit plan is to receive no payment at all[;] therefore[,] the reduced amount under the government benefit program is accepted in payment by the hospital.
 

 “ ‘Likewise, with regard to the amount accepted from a Blue Cross/Blue Shield patient, such amount is paid under a contract between the health insurer and the hospital. By contract, Blue Cross/ Blue Shield conducts an independent audit of the hospital in order to arrive at a per diem cost reimbursement per patient amount. Blue Cross/Blue Shield pays the hospital for treatment of its contract holders based upon this said contract cost reimbursement rate, which[, the director] testified, has many factors taken into consideration other than the cost of providing services to any single Blue Cross patient. In some cases, the per diem reimbursement rate is greater than the cost of providing services and in other eases, the said per diem rate is less than the cost of providing services. However, in order to be an institution which is qualified to receive Blue Cross reimbursement for treatment of Blue Cross patients, which is a vast majority of individuals in Alabama, the contract rate must be accepted. Again, [the director] testified that [the hospital’s] willingness to accept Blue Cross reimbursement as payment for hospital services rendered to a Blue Cross patient [is based upon] many other factors and considerations other than the cost or the value of the services rendered to the said Blue Cross patient.’ ”
 

 27 So.3d at 516. In addressing the Rob-ertses’ arguments that the amount the hospital charged was unreasonable because it accepted lesser amounts from
 
 *42
 
 Medicare, Medicaid, and Blue Cross, the Court of Civil Appeals held:
 

 “In an attempt to rebut the hospital’s evidentiary showing, counsel for the Robertses sought to direct the trial court’s attention to the hospital’s practice of accepting less than the full amount of its billed rates from patients having contractual or legal relationships with third-party payors, such as Blue Cross and Blue Shield. Medicare, and Medicaid. For that evidence to be material and relevant, it would have had to bear upon the question of the ‘reasonable value’ of the hospital’s services. However, as the trial court’s summation of the testimony of the hospital’s director of reimbursement given on cross-examination would indicate, that court deemed such evidence to be of no probative value concerning the ultimate question of the ‘reasonable charges’ assessed against the Robertses.
 

 “The trial court’s decision not to deem persuasive evidence of sums paid to the hospital under different financing schemes does not amount to reversible error. As the director explained in his testimony, the hospital’s acceptance of lower payments from Blue Cross and Blue Shield, Medicare, and Medicaid patients stemmed from legal and contractual requirements that applied solely to those classes of patients. ...
 

 “Our conclusion that the trial court could properly disregard evidence of the hospital’s practice of accepting less than full reimbursement from third-party payors in other contexts is consistent with decisions in other states. For example, in
 
 Parnell v. Madonna Rehabilitation Hospital, Inc.,
 
 258 Neb. 125, 602 N.W.2d 461 (1999), the Nebraska Supreme Court rejected as inconsistent with that state’s hospital-lien statutes an argument similar to that made by the Robertses, i.e., that the ‘usual and customary charges’ of the hospital treating a patient injured by a tortfeasor should be less than the billed charges ....
 

 “... [S]ee also
 
 Parnell v. Good Samaritan Health Sys., Inc.,
 
 260 Neb. 877, 880, 620 N.W.2d 354, 357 (2000) (declining to reconsider that principle of law). To like effect is
 
 Hillsborough County Hospital Authority v. Fernandez,
 
 664 So.2d 1071 (Fla.Dist.Ct.App.1995), in which a Florida appellate court held that evidence of discounts extended by a hospital to patients enrolled in health-maintenance organizations and preferred-provider organizations and to patients eligible for Medicare, Medicaid, and workers’ compensation benefits did not sufficiently support a judgment reducing a hospital lien extending to ‘all reasonable charges’ by 38 percent.”
 

 27 So.3d at 517-18. Thus, under
 
 Roberts,
 
 the use of the rates paid by Medicaid, Medicare, and Blue Cross as a benchmark for the reasonableness of a hospital’s charges is not persuasive.
 
 [7]
 

 
 *43
 
 Other courts have noted, like Abernathy, that a determination of reasonable charges for medical services requires an analysis of the medical services provided to each individual patient. Thus, a determination of a reasonable fee requires an individual analysis of each medical service provided each class member. In
 
 Colomar v. Mercy Hospital, Inc.,
 
 242 F.R.D. 671 (S.D.Fla.2007), the plaintiff, Colomar, received respiratory treatment at Mercy Hospital, Inc. (“Mercy”), after she was exposed to a pesticide. Colomar was uninsured and did not qualify for Medicaid or other assistance programs. Before receiving any treatment, Colomar executed an admission contract in which she agreed to pay for the treatment Mercy was to provide. It was undisputed that the price she would be charged was “undefined”; Florida law thus required the price in such case to be “reasonable.”
 
 [8]
 

 Colomar alleged that uninsured patients were charged unfairly and unreasonably high prices for the medical services they received from Mercy, that insured patients and patients receiving government benefits were charged significantly less for the same services, and that the prices charged bore no relationship to Mercy’s costs of providing the services. Colomar thus sought to certify a class action representing all individuals who had received medical treatment at Mercy who were uninsured at the time and sought monetary recovery for the purported overpayments. She also sought injunctive relief barring Mercy from continuing to “overcharge” the class and moved the trial court to certify a class action.
 

 The trial court denied the motion to certify a class action; it stated that the
 

 “chief weakness is that [Colomar’s] claims — which are based on the reasonableness of the charges in her particular case — are so fact intensive that individual issues predominate over the common ones defeating certification of the Damages Class under Rule 23(b)(3)[, Fed. R.Civ.P.]. Likewise, the reasonableness of [Colomar’s] particular bill does not support declaratory or injunctive relief on behalf of a class as a whole. Therefore, certification of the Injunctive Class under Rule 23(b)(2) is improper.”
 

 242 F.R.D. at 673.
 

 In determining whether Mercy’s charges were reasonable, the court in
 
 Colomar
 
 stated:
 

 “[T]he legality — or ultimate reasonableness — of Mercy’s charges can only be determined by looking at the specific bills in question and analyzing them against factors like the market rate for the same services at other hospitals, Mercy’s internal costs for those particular services, and the prices Mercy charged for those services to patients with health insurance or other benefits. None of the evidence underlying these factors will be the same for any two class members, unless they received the same services during a similar time frame. ...
 

 “... In order to establish her
 
 prima facie
 
 case, [Colomar] will need to prove that Mercy’s charges for its respiratory services are unreasonable in light of (1) Mercy’s costs for those respiratory services, (2) what Mercy charges other patients — including those with benefits or insurance — for those same respiratory
 
 *44
 
 services, and (3) what other hospitals charge for like respiratory services. Other uninsured patients in the class will be required to undertake a similar analysis, but that analysis will entail entirely different services and, hence, entirely different facts. Proving her case that Mercy’s respiratory services are unreasonable will not prove anything about the reasonableness of Mercy’s cardiac services, to take one example. Indeed, even with regard to respiratory services exactly like those [Colomar] received, the analysis will differ across different time periods. Whether her charges were unreasonable in 2003— when she was a patient at Mercy — will prove little about whether Mercy’s prices for respiratory services in 1999 were reasonable. This is not the case where [Colomar] can simply show that her charges were unreasonable and therefore establish Mercy’s liability to each class member.”
 

 242 F.R.D. at 676-77.
 

 Further, the court rejected reference to the rate paid by third-party payors for medical services as a basis for determining whether Mercy’s charges were reasonable:
 

 “While it may be true, for example, that Mercy charged patients with insurance or governmental benefits at rates that
 
 average
 
 roughly 60-70% below Charge-master rates, that fact does not establish that Mercy’s Chargemaster rates for respiratory services are inflated by 60-70%. It certainly does not justify a conclusion that each of Mercy’s many services is inflated by 60-70%. Similarly, the fact that Mercy’s average Chargemaster rates are four-and-a-half times the rates charged to Medicare does little to show how excessive any particular set of services might be. The average does not even establish the reasonableness of [Colomar’s] respiratory services, let alone the thousands of other items on Mercy’s Chargemaster. The use of averages is simply too blunt an instrument to accurately or fairly adjudicate these important issues.”
 

 242 F.R.D. at 681.
 

 In
 
 Maldonado v. Ochsner Clinic Foundation,
 
 493 F.3d 521 (5th Cir.2007), three uninsured patients who received medical treatment from Ochsner Clinic Foundation (“Ochsner”) were billed standardized chargemaster rates for their medical care. The patients sued Ochsner, seeking damages for breach of contract, arguing that Ochsner offered discounts from the chargemaster rates to patients with private insurance plans or those covered by Medicare or Medicaid; the patients claimed that the undiscounted charges were unreasonable and sought to certify a class action. The trial court denied class certification, holding that a determination of a reasonable price for each class member would require individualized determinations inappropriate for class certification.
 
 Maldonado v. Ochsner,
 
 237 F.R.D. 145, 154 (E.D.La.2006). The patients appealed.
 

 The United States Court of Appeals for the Fifth Circuit affirmed the district court’s judgment, holding that the patients had failed to demonstrate that class certification was appropriate under either Rule 23(b)(2) or Rule 23(b)(3), Fed.R.Civ.P. As to a Rule 23(b)(2) class action, the court held:
 

 “[I]ndividualized issues here overwhelm class cohesiveness. The amount patients were charged and the amount that is ‘reasonable’ for the services they received is necessarily an individual inquiry that will depend on the specific circumstances of each class member, the time frame in which care was provided, and both Ochsner’s and other hospitals’ costs at that time. ... Other variables
 
 *45
 
 exist. The discount from the charge-master rate paid by Ochsner’s insured patients varies widely depending on the insurance provider and the particular procedure involved. Similarly, the amount paid by the class members themselves varies significantly, as Ochs-ner offered numerous discounts to uninsured patients. In fact, the vast majority of uninsured patients paid
 
 nothing,
 
 making it unclear what they would gain from an injunction.”
 

 493 F.3d at 524-25 (footnotes omitted).
 

 For similar reasons, the court held that certification of a class action was also inappropriate under Rule 23(b)(3):
 

 “This case cannot pass muster under the Rule 23(b)(3) criteria, as [the patients] present no sensible way to resolve the dispute on a class-wide basis. The district court fully explained these problems. We begin by acknowledging that class-wide breaches of state law are alleged and raise some ‘common’ issues of law and fact. Suffice it to emphasize here, however, that given the state court’s dictate that the reasonableness of medical fees depends on multiple factors, including the services rendered, patient’s financial status, and customary fee for similar services, ... it is unlikely [the patients] could ever demonstrate that the chargemaster rates are unreasonable. Moreover, the court cannot simply require Ochsner to refund to uninsureds the difference between what they paid, if anything, and what insured patients paid because, as [the patients] admit, insured patients paid a wide variety of discounts from the chargemaster rates depending on the individual contracts and the specific procedures involved in their care. At this level, there is not one charge for insured patients and one charge for uninsured patients, but an array of charges tailored to each patient’s treatment. In addition, the percentage of the chargemaster rate paid by an individual insurance company may vary from procedure to procedure. The fact-specific rather than class-oriented nature of the claims thus predominates not only at the plaintiffs’ level, since two patients’ care and financial circumstances are hardly ever comparable, but also in determining a ‘reasonable’ charge for each service from among the melange of third-party payer discounts.”
 

 493 F.3d at 525-26 (footnotes omitted).
 

 Similarly, in
 
 Howard v. Willis-Knighton Medical Center,
 
 supra, a plaintiff sought a class action challenging whether charge-master rates were reasonable charges for purposes of a hospital-lien statute. The court noted, however, that determining the reasonableness of charges presents numerous individualized issues:
 

 “The testimony given in this case establishes that it is common practice to bill all patients the full chargemaster rate, but collection of that amount is contingent on a myriad of individual circumstances. ... [The testimony further indicated that] the hospital, in many cases, discounts the bill according to the patient’s circumstances, including the amount of money available and the financial status of the patient. Thus, the reasonableness of charges inquiry requires individual considerations that may include, for example, the patient’s financial status, the actual hospital services rendered, their customary value, and the amount of a recovery from a third party or his insurer, if any.
 

 “The fact that [the hospital] entered into agreements with health insurers that provide for discounted rates to insured patients does not prove that the hospital’s chargemaster is unreasonable with respect to uninsured patients.”
 

 924 So.2d at 1262-63.
 

 Under Alabama law, a determination of a reasonable charge for medical services in
 
 *46
 
 this case will require an examination of the circumstances of the charges for the services, the customs in the medical-service community, the price a willing provider would take for its services, and the price a recipient of those services would pay.
 
 Cardon,
 
 supra, and
 
 Crump,
 
 supra. The testimony by the defendants as to normal rates charged by them will be relevant,
 
 Ex parte University of South Alabama,
 
 supra, as well as testimony concerning “the [defendants’] internal factors [and] the similar charges of other hospitals in the community.”
 
 Doe,
 
 46 S.W.3d at 198. We agree that such determinations are “necessarily an individual inquiry that will depend on the specific circumstances of each class member, the time frame in which care was provided, and both [the defendant’s] and other hospitals’ costs at that time.”
 
 Maldonado,
 
 493 F.3d at 524. Finally, the defendants’ acceptance of lower payments from Blue Cross, Medicare, and Medicaid stem “from legal and contractual requirements that applied solely to those classes of patients,”
 
 Roberts,
 
 27 So.3d at 517, and is not necessarily based on market factors or, as both Abernathy and Dr. Thorpe acknowledged, on the actual costs of the services provided. Thus, reliance on the rates paid by those entities may not be the baseline on which to calculate a reasonable charge for the medical services rendered.
 
 Roberts,
 
 supra;
 
 Colomar,
 
 supra.
 

 The plaintiffs contend that Dr. Thorpe’s formula takes into account the market rate for the same services at other hospitals, inferred costs, and prices paid for those services by other patients by using the cost benchmarks set by Medicaid, Medicare, and Blue Cross. However, as noted above, Dr. Thorpe admitted that Medicare does not take into account all actual costs in its baseline “cost” determination and admitted that he did not know how Blue Cross calculated its cost-to-charge ratios. Additionally,
 
 Roberts
 
 notes that the rates paid by Medicare and Medicaid are dictated by law and “ ‘in no way reflectf ] upon the cost or the value of the services rendered to such patients.’ ”
 
 Roberts,
 
 27 So.3d at 516 (quoting trial court’s order). Further, the cost-reimbursement rate paid by Blue Cross “ ‘has many factors taken into consideration other than the cost of providing services to any single Blue Cross patient.’ ”
 
 Roberts,
 
 27 So.3d at 516 (quoting trial court’s order).
 

 The weight of the authorities and the testimony at the class-certification hearing indicate that the plaintiffs’ method of calculating a reasonable charge for the medical services provided by the defendants involves heavily individualized determinations for each class member. We agree with the court in
 
 Maldonado
 
 that the individualized issues presented in determining a reasonable charge “overwhelm class cohesiveness” and render certification of a class action under both Rule 23(b)(2) and Rule 23(b)(3), Ala. R. Civ. P., inappropriate. Thus, the plaintiffs have failed to “carry the burden of producing sufficient evidence to satisfy the requirements of Rule 23,”
 
 Compass Bank,
 
 823 So.2d at 672, and the trial court exceeded its discretion in certifying a class action.
 
 Smart Prof'l Photocopy Corp.,
 
 850 So.2d at 1249. Therefore, the trial court’s certification order is vacated, and the case is remanded for further proceedings consistent with this opinion.
 

 ORDER VACATED AND CASE REMANDED.
 

 COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
 

 [1]
 

 . A summary judgment was later entered in favor of CHS, and CHS is not a party to this appeal.
 

 [2]
 

 . A hospital’s "chargemaster” is a list specifying charges for all procedures and treatments administered by the hospital.
 

 [3]
 

 . In support of the contention that this Court may address the merits of the plaintiffs’ claims, the defendants quote
 
 Mutual Savings Life Insurance Co. v. James River Corp. of Virginia,
 
 716 So.2d 1172, 1180 (Ala.1998), which states that "[tjhere would be no reason to certify a class on a claim that is not viable.” However, in that case, the claims on which the plaintiffs sought class certification had been previously dismissed by the trial court for failure to state a claim under Rule 12(b)(6), Ala. R. Civ. P. Additionally, the defendants cite
 
 Bill Heard Chevrolet Co. v. Thomas,
 
 819 So.2d 34, 41 (Ala.2001), for the proposition that the trial court must "go behind the pleadings” in making a certification determination. However, that decision quotes
 
 Castano v. American Tobacco Co.,
 
 84 F.3d 734, 744 (5th Cir.1996), for that proposition, which in turn cites
 
 Eisen v. Carlisle & Jacquelin,
 
 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), stating that "it [is] improper to make a preliminary inquiry into the merits of a case [and] determine that the plaintiff was likely to succeed .... ”
 
 Castano,
 
 84 F.3d at 744. These authorities do not demonstrate that this Court may address the underlying merits of the plaintiffs' claims.
 

 [4]
 

 . Lakeview moved the trial court to certify an interlocutory appeal under Rule 5, Ala. R.App. P., on questions related to whether the plaintiffs could recover from the defendants even though they had not yet attempted to pay their bills; this motion was denied by the trial court.
 

 [5]
 

 . Dr. Thorpe’s name is at times referred to in the record — notably in the reporter's transcript — as “Kim Thorpe.”
 

 [6]
 

 . Dr. Thorpe testified that, on average, uninsured and self-pay patients pay only 13% of the cost of their medical services. The record indicates that Lawrence and Nichols did not pay any portion of their bills.
 

 [7]
 

 . The plaintiffs contend that this Court, in
 
 Liberty National Life Insurance Co. v. Allen,
 
 699 So.2d 138 (Ala.1997), endorsed the application of Medicare rates as the reasonable and customary charge for medical services. However, in that case, which sought damages for bad-faith failure to pay insurance benefits, this Court held that an insurance provider's reliance on Medicare law provided an “arguable basis’’ for it to pay its insured, a Medicare participant, benefits for medical care at the rate provided by Medicare. Specifically, the policy in that case provided that benefits would not be paid in excess of " 'the reasonable and customary charges.’ ” 699 So.2d at 143. The insurance provider argued, and this Court agreed, that there was an arguable basis on which to conclude that, in the context of a Medicare participant, "reasonable charges” would be the charge a provider could charge a person under the Medicare law. Contrary to the plaintiffs' argument,
 
 *43
 
 that case did not endorse the application of Medicare rates as the reasonable charge for medical services outside the Medicare context. 699 So.2d at 143.
 

 [8]
 

 . As noted above, the defendants in the instant case contend that the price term was in fact defined in the admission contract.